(No. 55948.—▮▮▮▮▮▮▮▮)

*In re* MARRIAGE OF JOHN DELANCE THOMPSON, Appellee, and KATHRYN MAE THOMPSON, Appellant.

*Opinion filed April 13, 1983.—Rehearing denied May 27, 1983.*

68

Thomas J. Logue, of Glenn & Logue, of Mattoon, for appellant.

Laurence W. Grabb, of Ryan, Grabb, Cini & Bennett, of Mattoon, for appellee.

JUSTICE CLARK delivered the opinion of the court:

An order was entered in the circuit court of Coles County on May 6, 1981, dissolving the marriage of Kathryn Mae Thompson to John Delance Thompson. Kathryn Thompson appealed certain portions of the order and also asserted that the court should have deferred jurisdiction to a trial court in the State of Michigan. In her appeal Kathryn contended that the award of custody was contrary to the manifest weight of the evidence, the division of property was erroneous, the court erred in sustaining the objection to her offer of proof of petitioner's reputation, and the trial court erred in refusing to allow her to reopen her case.

The appellate court found that (a) the circuit court of Coles County acted properly in refusing to defer jurisdiction to a trial court in the State of Michigan; (b) the award of permanent custody to John Delance Thompson was not contrary to the manifest weight of the evidence or a breach of discretion; (c) there was no error in the division of property except for an apparent inadvertent

omission of $371 that was due Kathryn Mae Thompson; (d) the trial court properly sustained the objection to the respondent's offer of proof of petitioner's reputation; and (e) the trial court did not abuse its discretion in refusing to reopen the case. 100 Ill. App. 3d 1203 (Rule 23 order).

John and Kathryn Thompson were married on November 16, 1973, in Pontiac, Michigan. Thereafter, John Thompson took a position with McBride's Express in Decatur, Illinois. John and Kathryn were living in Decatur on April 18, 1977, when their only child, Daniel, was born. In August of 1977, when Daniel was approximately four months old, the family moved to Lerna, Illinois, where John accepted a position with the H & F Trucking Company.

On November 30, 1979, John told Kathryn that he had to leave town on business, when in fact he intended to spend the night in Collinsville, Illinois, with a female business associate. Kathryn was aware of what actually occurred and on December 1, 1979, she left Lerna with Daniel and left a note indicating that she was returning to her parents' home because her father was ill.

John constantly called to inquire about Kathryn and Daniel. Kathryn at first denied there were any marital problems, and she attempted to conceal her whereabouts and the whereabouts of the child.

On December 7, 1979, John filed a petition in the circuit court of Coles County for dissolution of marriage and for temporary custody of the child. In the petition it was alleged that the child had medical problems and it was in the best interest of Daniel that custody be awarded to the father. The petition was allowed, and an order was entered on December 7, 1979, granting temporary custody to the father.

John continued to call on a regular basis, trying to contact his wife or her parents, in order to determine

the condition and whereabouts of his son. On December 10, 1979, John retained the services of an investigative agency.

Following a short stay at her parents' home Kathryn moved with Daniel to a home for battered women in Saginaw, Michigan. On December 12, 1979, Kathryn filed for and was granted temporary custody of her son in the circuit court for Saginaw County in the State of Michigan.

On December 30, 1979, the investigator John had hired notified John that he had located Kathryn and Daniel. John arranged to fly to Michigan, with the court order in hand, to obtain physical custody of his son. John forcibly abducted his son from Kathryn on a street in Saginaw, Michigan, placed Daniel in the detective's car and proceeded to the investigator's home. At that time he called the Saginaw police department as well as Kathryn's attorney in Michigan to notify them of the situation. John denies that he knew then that there was a court order giving custody of Danny to Kathryn. The investigator indicated that his employees had attempted to discover if there was a court proceeding pending concerning custody, but that they had failed to discover anything.

The investigator, Robert Swartwood, testified as to Danny's physical condition at the time the child was picked up in Saginaw.

According to Mr. Swartwood, Danny was without mittens, his cheeks were windburned, he had a cold with a deep cough, he had a small bruise under one eye, and that eye was constantly tearing. The investigator's wife, who was present when Danny was found, testified that she also examined Danny at the time and found chapped lips, tearing in one eye, and a runny nose.

After John took Danny from Kathryn, he traveled back to the family home in Lerna, Illinois. Upon arriving

back in Lerna, John took Danny to see a doctor on three successive days; antibiotics and eardrops were prescribed. According to John, Danny's right ear was inflamed, his left ear was full of wax, and when spoken to by his father he had trouble hearing him. Further ear surgery was required in March of 1980.

Following the father's and son's arrival back in Lerna, John went back to work for H & F Trucking Company. He and Danny continued to live in the same home in Lerna that had been the marital residence.

In January of 1980, John began seeing a woman by the name of Betty Coffman. Ms. Coffman and John saw each other regularly for the next five months, with Ms. Coffman frequently spending weekends at John's home. During two of those months John also had a cousin by the name of Kenneth Dolson living in the house. Ms. Coffman testified that during her weekend visits she slept with John, and that she took the same care of Danny that she took with her own two children. Ms. Coffman indicated that Danny always had the sniffles, coughed frequently and had ear trouble. She further testified that she would change his diapers, cook his meals, and change and wash his clothes. Ms. Coffman testified on cross-examination that John was a good, loving father who looked after the medical and other needs of his child. She also testified that John and she talked on several occasions prior to the custody hearing and on one such occasion, according to Ms. Coffman, John reminded her that "I [John] have some pictures and don't forget there is a custody hearing coming up." Ms. Coffman indicated that the pictures John was referring to were nude pictures of Ms. Coffman that John had taken when they were seeing one another.

Ms. Coffman also testified that John came to her house in West Terre Haute, Indiana, one evening and that she would not open the door. John said he wanted

to talk with her. She would not talk to him because she was afraid of him. John said that he would be back and that she had not seen the last of him. Ms. Coffman swore out a warrant for John's arrest which is still pending; John did not return. Ms. Coffman indicated that she broke off the relationship with John because he was seeing another woman.

Soon after John and Danny returned to the home in Lerna, John made arrangements for Danny's day care at the home of Virginia Sons.

Mrs. Sons testified that when she first met Danny he was insecure, clinging, and sickly. She also testified that he tired easily and had colds, which included ear infections. She further found that he was undisciplined, not potty-trained, and had poor eating habits. She felt he was overweight, withdrawn and in need of special attention. Her husband, Gerald Sons, testified that when he first saw Danny he was insecure, sickly, cried a lot and was a picky eater. Mrs. Sons felt that she saw dramatic changes in Danny within the first six months that John had Danny. She testified that Danny was less susceptible to colds, that he did not tire as easily, and that his ear infections cleared up. She observed him become comfortable, more stable and secure. She observed a happy little boy, glad to see his father. Mrs. Sons testified that John's attitude towards his son was very good, that he (John) was a concerned, responsive parent, and that as a result the child slimmed down and appeared to be very content.

Virginia's husband, Gerald Sons, testified that, during the period of time in 1980 when he was around the boy, Danny's emotional condition improved and he was well adjusted. Mr. Sons felt that John was conscientious and observed John and Danny kissing and hugging on many occasions.

Kathryn's first effort to contact Danny occurred on

January 25, 1980, almost four weeks after John had brought him back home. Kathryn talked to Danny on the telephone on March 9, 1980. Kathryn admitted, under cross-examination, that she did not inquire about Danny between January 25, 1980, and March 9, 1980. Kathryn did not make any direct calls to John or to Danny or visit Danny between March 9, 1980, and a visitation which occurred in November of 1980.

Around Easter of 1980, Kathryn sent an Easter card to Danny and again around his birthday in April she sent a birthday card and doll. She sent another card in July of 1980. The final written communication occurred near Thanksgiving of 1980, when she sent a Thanksgiving card.

On July 1, 1980, Kathryn appeared in the circuit court of Coles County and testified for the purpose of obtaining an order for a preliminary injunction against John disposing of any property and, while in Coles County, made no effort to contact Danny.

Kathryn asserts that she did not contact Danny because her previous attorney advised her not to speak with John. Danny was not capable of picking up the phone at that time. Kathryn also asserts that she was afraid of John and, therefore, did not visit Danny as often as she would have liked.

Jesse Thompson was a friend and co-worker of John Thompson at the H & F Trucking Company. He testified that he saw a significant improvement in Danny's health and that he (Jesse) observed a very warm and loving father-son relationship.

Mr. James Collin, a contractor who was working on renovations in John's home, testified that during that spring and summer of 1980 he observed Danny as a normal child and that Danny and John often would sit and play the banjo and games together and that they seemed to have a good relationship.

Kathy Bean, operator of a local restaurant in Mattoon, came to know John and Danny Thompson as customers. She testified that during that spring and summer she observed a child who became more sure of himself as time went on, and that he seemed polite, clean and well adjusted. She described him as "a very robust, shining little boy." She believed that John was crazy about Danny.

Reverend Richard Anderson came to know John and Danny through the Loxa Presbyterian Church in Mattoon. According to Rev. Anderson they attended services from January through June of 1980, and he felt John was conscientious about Danny's proper religious training and that John and Danny exhibited a sincere and caring attitude towards one another.

One neighbor who knew John and Kathryn when they were residing together in Lerna testified that Kathryn had told her on one occasion that she would be glad when Danny got bigger because it was hard for her to cope with a little baby. John also testified as to Kathryn's supervision of the child. According to John, on one occasion he found Daniel unsupervised in the yard playing with scissors, and on another occasion unattended in the bathtub. John also testified that Kathryn would punish Danny for crying.

Barbara Hart testified that on one occasion Danny was left crying for about 45 minutes until he finally fell asleep. Ms. Hart also indicated that during the summer and early fall of 1979, Danny was overwrought, wore ill-fitting clothing and improperly pinned diapers, and ate food not properly prepared.

Ms. Hart also testified as to Danny's condition when John and Danny returned to Lerna. Ms. Hart observed a change in Danny. She testified that he came out of his shell, that his clothes fit, and that he was properly dressed.

John testified that he continued his employment with H & F Trucking until June of 1980 at which time he accepted employment with Advance Transport in Effingham, Illinois. There was also testimony from John's employer at H & F Trucking that, while John resigned, he (John) sought to return to H & F Trucking before he accepted employment with Advance Transport, but he was not rehired. The employer at H & F Trucking testified that John took various salvage items and distributed them amongst his friends.

He worked for Advance Transport until August of 1980 and, thereafter, began employment with Complete Auto Transport in October, where he was employed at the time of the hearing.

At the time of the hearing, John and Danny lived in Highland, Illinois, in a ten-year-old, three-bedroom home on approximately one acre of land. According to John, a hospital and daycare center were nearby and he had made arrangements for Danny to begin kindergarten. John testified that he has seen to the proper religious education of Danny.

According to John he has spent all of his time, when not at work, with Danny.

The appellate court, in a Rule 23 order, found that because the counsel for Kathryn did not raise the issue timely, the issue of whether the circuit court of Coles County had improperly exercised its jurisdiction had been waived. While we do not deem a question of jurisdiction to be waived, we do find that the circuit court acted properly in rejecting an untimely request for deferral to a trial court in Michigan.

Counsel did not ask the circuit court to consider deferring the case until closing arguments were being made on January 21, 1981, more than a year after the case had begun.

The Uniform Child Custody Jurisdiction Act (Ill. Rev.

Stat. 1979, ch. 40, par. 2101 *et seq.*) provides guidelines to avoid conflict and competition with courts of other States in determining matters of child custody. We agree with the appellate court that one of the purposes of the Act is to assure that litigation concerning the custody of a child takes place in the State in which the child and his or her family have the closest connection. Another is to deter abductions and other unilateral removals of children undertaken to obtain custody awards. Ill. Rev. Stat. 1979, ch. 40, pars. 2102(3), (5).

Section 4(a)(1) of the Act (Ill. Rev. Stat. 1979, ch. 40, par. 2104(a)(1)) provides that the circuit courts have "jurisdiction" to make a child-custody determination if the State is the home State of the child at the time of the commencement of the proceeding or had been the child's home State within six months before commencement of the proceeding. However, section 9 also provides that "[i]f the petitioner for an initial judgment has wrongfully taken the child from another state or has engaged in similar reprehensible conduct the court *may* decline to exercise jurisdiction if this is just and proper under the circumstances." (Emphasis added.) Ill. Rev. Stat. 1979, ch. 40, par. 2109(a).

We strongly disapprove of John's conduct in forcibly obtaining physical custody of Danny from Kathryn in Michigan and returning him to Illinois. John maintains he used diligence to determine whether any Michigan court had ruled on the child's custody. Regardless, like the appellate court, we deem John's actions to be the type of conduct section 9(a) was designed to prevent. The aggrieved spouse is able to request the forum State to decline to exercise jurisdiction so that the wrongful obtaining of custody will not determine the forum for the decision. Had counsel for Kathryn made such a request here, before the court heard the case on the merits in its entirety, she may have had a valid claim. However,

no such request was made in the trial court until the closing arguments on January 21, 1981, more than a year later.

We therefore find that because counsel for Kathryn failed to request deference to the Michigan courts prior to the commencement of this proceeding, and since the merits of this case had been heard prior to the request that deference be entertained by the circuit court of Coles County, the court properly rejected such a consideration.

We now ask if the custody award by the trial judge was against the manifest weight of the evidence. We have recited at length the testimony at trial, and we feel that a lengthy commentary on that testimony is not called for here.

The respondent, Kathryn Thompson, argues that *Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, strongly supports her contention that she should be awarded the child. The respondent asserts that the appellate court ignored the mandate of *Jarrett* in not addressing the "moral transgressions" of John. *Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, is authority for the proposition that a child should be placed with the parent who can best serve that child. The *Jarrett* case does not establish a conclusive presumption that, because a custodial parent cohabits with a member of the opposite sex, the child is harmed. No such presumption exists in this State. The court in *Jarrett* indicated that a custody award is not arrived at by pressing one lever and mechanically denying custody to one parent; rather all of the circumstances must be considered that affect the best interests of the child. *Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, 344-45; Ill. Rev. Stat. 1979, ch. 40, par. 602.

A considerable number of witnesses testified on behalf of petitioner indicating Danny was sickly, undisciplined and overweight prior to coming into John's cus-

tody, and that thereafter Danny improved, and a warm, loving relationship developed between the father and the son.

That is not to say we condone all of the father's conduct. We do not. We recall Ms. Coffman's testimony that the petitioner threatened to reveal pictures of her in the nude if she testified against him. While such evidence troubles us a great deal, we have determined that such conduct is outweighed by the evidence presented which demonstrates that a healthy relationship existed between father and son and that Danny was doing well in his father's custody.

Based upon our exhaustive review of the evidence, we find that there has been no showing that the trial court judge abused his discretion in awarding custody of Danny to his father.

The respondent also contends that she should have been permitted to reopen the case prior to the entry of the judgment in the case but after the proofs were closed, in order to allow her to introduce evidence concerning petitioner's reputation.

In not reopening the case to receive additional evidence, the respondent contends that the trial court abused its discretion. The respondent offers no support for her position, and we find none. The trial court did not abuse its discretion.

We further uphold the appellate court's judgment respecting the property division, including its remand of the cause to the circuit court of Coles County to require the petitioner to pay to respondent one-half of a tax-refund check in the sum of $742 that was due respondent. John had previously forged Kathryn's name on the back of the check and cashed it. He does not presently dispute that Kathryn was entitled to receive $371 of the proceeds of that check.

The respondent did not contest in this court the ap-

pellate court's approval of the circuit court's sustaining of the objection to her offer of proof of the petitioner's reputation.

Accordingly, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

JUSTICE MORAN, specially concurring:

I concur in the judgment reached by the majority; however, I do not concur in the statement "The *Jarrett* case does *not* establish a conclusive presumption that, because a custodial parent cohabits with a member of the opposite sex, the child is harmed." (Emphasis added.) (96 Ill. 2d at 78.) In my opinion, *Jarrett* did establish a conclusive presumption. See the dissent in *Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, 352-53 (Moran, J., and Goldenhersh, C.J., dissenting), and also the dissent of Justice Brennan, joined by Justice Marshall, from denial of the writ of *certiorari* in *Jarrett v. Jarrett* (1980), 449 U.S. 927, 66 L. Ed. 2d 155, 101 S. Ct. 329.

JUSTICE UNDERWOOD, dissenting:

I believe the trial judge abused his discretion in denying the mother's prejudgment motion to reopen the proofs and present additional evidence.

The majority opinion notes the father's illicit affairs, abduction of Danny, and threats to the potential witness, but does not mention several other matters which, if true, seem to me quite significant. It is asserted that the father has two children by a prior marriage, a daughter whom he has not seen in nine years and a son whom he has never seen; that he is under a court order to pay $100 weekly for their support; that since the hearing he has lost the employment he held at that time; and that he has instituted bankruptcy proceedings. Certainly proof of these facts would be persuasive on the questions of custody and the father's ability to support the child.

The dissenting appellate court justice believed the trial court's award of custody to the father was contrary to the manifest weight of the evidence, a position with which I am inclined to agree. The mother denied or gave rational explanations for the occurrences recited by the majority in support of the result it reaches. For example, the absence of mittens was due to the fact that they were torn from the boy's hands during the struggle at the time he was abducted by the father. The absence of more frequent contacts by the mother was due, she testified, to her attorney's advice and her fear of the father, a fear shared by at least one of the father's sexual partners.

I believe the additional evidence the mother seeks to offer may well tip the scales more clearly in her favor. Consequently, I would reverse the circuit and appellate courts and remand the cause to the circuit court for reconsideration in the light of such additional evidence as may be presented.

JUSTICE GOLDENHERSH joins in this dissent.