*In re* MARRIAGE OF R.S., Petitioner-Appellant, and S.S., Respondent-Appellee.

Third District    No. 3—96—0198

Opinion filed December 16, 1996.

Zane L. Lucas, Jr., of Carter & Grimsley, of Peoria, and Patricia M. Logue (argued), of Lambda Legal Defense & Education Fund, of Chicago, for appellant.

William M. Anderson, IV (argued), of Anderson Law Offices, of Creve Coeur, for appellee.

Barbara L. Wilcox, of Law Offices of Barbara L. Wilcox, of Geneva, for *amicus curiae*.

PRESIDING JUSTICE BRESLIN delivered the opinion of the court:

We are asked in this appeal to determine whether the trial court erred when it modified a prior custody arrangement based on the custodial parent's homosexual relationship and the possibility that the children could experience social condemnation as a result of this relationship. We hold that the potential for social condemnation, standing alone, cannot justify a change in custody. Moreover, we find that the noncustodial parent failed to meet the burden of proof required to justify a modification of custody. Thus, for the reasons that follow, we reverse the trial court's judgment.

R.S. and S.S. married in 1983 and subsequently had two children. When the parties divorced in July 1991, they agreed that the mother should have sole custody of the children.

The father remarried in 1993. In August of that year he filed the instant petition for modification of custody. In his petition, the father alleged that a substantial change in circumstances had occurred because he had remarried and the mother had embraced an openly homosexual lifestyle, placing her sexual desires ahead of the emotional, moral and educational needs of the children by residing with her homosexual partner. He further alleged that her live-in partner had contracted mononucleosis and hepatitis and that it would be detrimental to the children's emotional, physical and moral well-being to have them remain in the mother's home.

The following facts were adduced at the hearings on the father's petition. The mother and her partner, J.S., who are both bisexual, met in 1993 at the hospital where they work. J.S. moved into the mother's home later that year. Soon after she moved in, J.S. contracted mononucleosis and hepatitis from one of the children, who had a virus. However, J.S. took several precautions and avoided infecting the remaining members of the household. She recuperated fully from this illness. In June 1994, the mother sold her home and moved with the children into J.S.'s home in a nearby town.

All of the parties, including the father, agreed that the children were well-adjusted and were not experiencing any problems. The father testified that the children have been reluctant to return to the mother following visitation. Likewise, the mother testified that the children have been reluctant to visit with the father.

The father testified that the children were doing well in school and extracurricular activities and were getting a good education. He

also testified that the children looked healthy, dressed appropriately and ate regularly. He testified that he believed the children were afraid of him. He was concerned that J.S. showed affection toward his daughter by hugging and kissing her. He stated that if he gained custody of the children, he would ask the court to restrict her contact with them.

The children's paternal grandmother testified that before they moved out of town, she babysat the children three to four days a week after school. She stated that both parents had told her that she would have less contact with the children as they grew older. However, she spent less time with the children after they moved. She testified that the mother told her she was free to visit the children, but she took the children only when the mother asked her to take them. She made it a practice, however, to speak to the children each night on the telephone.

The mother testified that, after returning from a visit with their father, her daughter informed her that her father and grandmother had asked questions about the mother's relationship with J.S. As a consequence, the mother explained the nature of her relationship with J.S. to her daughter in general terms while her son was present. She also acknowledged her relationship with J.S. to her daughter's teacher when the teacher asked about her daughter's relationship to J.S. The mother testified that she and J.S. sleep in the same room, but the children have never seen them involved in any sexual relations. The father expressed disapproval of the mother's openness to the children about her homosexual relationship and argued that the mother should not have revealed the nature of her relationship with J.S. to the children.

The son's teacher testified that he was an A student and had no discipline problems. She stated that he got along well with other students and had adjusted well to the move. The daughter's teacher testified that she was an excellent student and that the mother actively participated in school activities.

The trial court appointed T.W. Mathews, a clinical psychologist, to perform a psychological home study and evaluation of the parties and the children. According to Mathews' report, the psychological and emotional needs of the children were being served by the existing custodial arrangement. He found nothing that would lead him to conclude that a change in custody would serve the best interests of the children. Mathews testified that there were no psychological problems evident in the children and that all adults on both sides agreed that the children were developing satisfactorily. He believed that all of the parties involved were "perfectly capable of meeting

the array of psychological concerns that are necessary to look out for the well-being of the children."

Mathews also testified that there was no empirical evidence that suggested that children growing up in a homosexual environment would experience increased psychological problems. He raised the concern that the children could be harassed because of the mother's relationship with J.S., but there was no evidence that the children had experienced any such harassment. Although he recognized that a change in custody would not insulate the children from possible social disapproval of their mother's sexuality, Mathews thought that there was slight weight in favor of the father being the primary custodian because of the possibility that the children will be harassed. He also testified that he had some concern about empirical evidence regarding male role modeling, but the information he had seen was ambiguous.

Mathews believed that the children's paternal grandmother was a positive influence on them and that she should continue to have contact with the children. He reported that she was primarily responsible for the children's stability throughout the divorce.

Theodore Chapin, a clinical psychologist hired by the mother, also performed evaluations of all of the parties. Based upon these evaluations and the children's preferences, Dr. Chapin recommended that the mother retain primary custody of the children. He concluded that the mother was very sensitive to her children's needs and had taken affirmative steps to address their needs. In addition, Dr. Chapin noted that the mother is very committed to J.S. and that the children had good relationships with her and J.S.

Dr. Chapin's test reports indicated that his first evaluation of the parties' son revealed that the boy suffered from low self-esteem, developmental immaturity and psychologically inhibited adjustment. He explained in the report that the low self-esteem was most likely attributable to the father's anger. However, he also believed that the parties' divorce and the child's inability to understand the mother's homosexual relationship could have contributed to these attributes. At a later evaluation, Dr. Chapin reported that these feelings had been resolved to a great extent.

Dr. Chapin testified that both children wished to live with their mother. Mathews testified that the parties' daughter preferred to stay with her mother, but he did not ask the parties' son if he had a preference. In addition, the trial court conducted *in camera* interviews with the children. Both children expressed a desire to remain living with their mother. The parties' son, who was seven years old at the time, explained that he liked his new home and

wanted to stay at his mother's house because he was used to it. The parties' daughter, who was 10 years old at the time, explained that she liked living at her mother's house better because her room was bigger, her friends lived in that town, and her dad's house felt empty to her.

After the testimony of the witnesses, the trial court found three factors which, together, amounted to a substantial change in circumstances: (1) the father's remarriage and the children's familial relationship with the father's wife and children; (2) the mother's involvement in a conjugal homosexual relationship; and (3) the mother's reduction in the children's contact with their paternal grandmother. Based on these circumstances, the court held it was in the best interests of the children to modify custody by awarding custody to the father.

The sole issue on appeal is whether the father presented clear and convincing evidence at trial to show that a change in custody was necessary to serve the best interests of the children.

■ Two elements must be proved to succeed in a petition to modify custody. First, there must be a change in the circumstances of the child or the custodial parent. Second, a modification must be necessary to serve the best interests of the child. 750 ILCS 5/610(b) (West 1994). The burden of proof rests upon the party requesting modification and that party must prove its case by clear and convincing evidence. *In re Custody of Dykhuis*, 131 Ill. App. 3d 371, 475 N.E.2d 1107 (1985). Changed conditions alone will not justify a modification of custody unless such conditions adversely affect the welfare of the child. *In re Marriage of Diddens*, 255 Ill. App. 3d 850, 625 N.E.2d 1033 (1993). While a court may consider the custodial parent's homosexual relationship when making a custody determination (*In re Marriage of Martins*, 269 Ill. App. 3d 380, 645 N.E.2d 567 (1995)), the trial court's function is limited to determining the effect of the parent's conduct upon the children (*Brandt v. Brandt*, 99 Ill. App. 3d 1089, 425 N.E.2d 1251 (1981)).

■ Section 610(b) of the Illinois Marriage and Dissolution of Marriage Act reflects an underlying policy favoring finality of child custody judgments and creates a presumption in favor of the present custodial arrangement that should not be lightly overturned. *In re Marriage of Wycoff*, 266 Ill. App. 3d 408, 639 N.E.2d 897 (1994). The purpose of this presumption is to promote stability and continuity in the child's custodial and environmental relationships. *Wycoff*, 266 Ill. App. 3d at 410, 639 N.E.2d at 900. The trial court's custody determination will not be reversed unless it was an abuse of discretion or contrary to the manifest weight of the evidence. *In re Marriage of Nolte*, 241 Ill. App. 3d 320, 609 N.E.2d 381 (1993).

■ Initially we note that two of the trial court's findings are unsupported by the record. First, the court found that the father and his new wife have "other children" with whom the parties' children have forged a familial relationship. The evidence supported the court's finding that the children had adjusted to their father's remarriage and had a good relationship with his wife. However, according to the record, the father and his new wife had only one child, a newborn who joined the home shortly before the December hearings. In addition, there was no evidence that the mother's living arrangements were unstable or that the children lacked a familial relationship where they were. On the contrary, the evidence established that the mother provided a nurturing home environment for the children and that she was meeting the children's emotional, educational and physical needs. Thus, while we agree that the father could provide a good home for the children, the children's relationship with his new family, standing alone, did not support a modification of custody. See *In re Marriage of Wycoff*, 266 Ill. App. 3d 408, 410, 639 N.E.2d 897, 900 (1994) ("It is a mistake to change custody from a good custodian in hopes that another may be better").

■ Second, the court found that the mother had limited the children's contact with their paternal grandmother. While it is true that the amount of time the children spend with their grandmother has been reduced, the record reveals that this reduction was related to the advancing maturity of the children, the move to a nearby town and the grandmother's reluctance to initiate contact on her own. There is no evidence that the mother has actively interfered with the relationship between the children and their grandmother. Indeed, they speak to each other nightly over the telephone. There is also no evidence that increasing the children's contact with their grandmother will provide benefits for them that outweigh the harm inherent in upsetting the stability and continuity in their custodial arrangement with their mother. Moreover, the court's concern regarding the amount of contact the children had with their grandmother could have been addressed by allowing visitation for the grandmother. See *In re Marriage of Balzell*, 207 Ill. App. 3d 310, 566 N.E.2d 20 (1991) (court may award grandparent visitation when there are special circumstances). Accordingly, we hold that the court's finding on this issue is against the manifest weight of the evidence.

■ Therefore, we are left with the mother's homosexual relationship as the sole change in circumstances which, it is alleged, should require a modification of custody. There is no question that the relationship itself exists. However, the court made no finding that the children were adversely affected by the relationship. To the contrary,

all the participants in the hearings below agreed that the children were healthy and well-adjusted. They participate in numerous activities and have no problems at school.

Neither the father nor the trial court could point to any negative consequences that had befallen the children as a result of the mother's sexual orientation or conjugal relationship. Instead, each theorized that the children might suffer some future social condemnation. The trial court noted that in *Bottoms v. Bottoms*, 249 Va. 410, 457 S.E.2d 102 (1995), the Virginia Supreme Court held that the potential for such social condemnation is a factor to be considered when making a custody determination. However, the *Bottoms* court also noted that a lesbian mother is not presumed to be an unfit parent. 249 Va. at 419, 457 S.E.2d at 108. Rather, the court held that custody determinations must be made by considering several factors, including "misconduct that affects the child." 249 Va. at 419, 457 S.E.2d at 107. In this regard, the *Bottoms* case is in accord with Illinois law, which requires custody determinations to be made by considering all of the circumstances that affect the best interests of the child rather than by applying *per se* rules. See *In re Marriage of Thompson*, 96 Ill. 2d 67, 78, 449 N.E.2d 88, 93 (1983).

Illinois and Virginia share this position with many other states. See *D.H. v. J.H.*, 418 N.E.2d 286 (Ind. App. 1981) (homosexuality, standing alone, is not grounds for denial of custody in the absence of showing that sexual misconduct had an adverse effect upon welfare of children); *Hall v. Hall*, 95 Mich. App. 614, 291 N.W.2d 143 (1980) (homosexuality is only one of many factors court should consider when making custody determination); *Nadler v. Superior Court*, 255 Cal. App. 2d 523, 63 Cal. Rptr. 352 (1967) (trial court erred by holding as a matter of law that mother was unfit on the basis that she is a homosexual); *Maradie v. Maradie*, 680 So. 2d 538 (Fla. App. 1996) (in determining moral fitness for purposes of custody determination, court must focus on whether parent's behavior has direct impact on child's welfare); *M.P. v. S.P.*, 169 N.J. Super. 425, 404 A.2d 1256 (1979) (trial court erred by modifying custody based solely on homosexuality of mother without regard to the welfare of the children); *Paul C. v. Tracy C.*, 622 N.Y.S.2d 159, 209 A.D.2d 955 (1994) (sexual preference is not determinative in child custody dispute unless it adversely affects children).

In the end, the *Bottoms* court changed the custody of the child to the maternal grandmother. The court, however, found that there was proof that the child had been harmed as a result of living with his mother. *Bottoms*, 249 Va. at 420, 457 S.E.2d at 108. Several factors, including incidents of significant abuse, neglect and abandonment, supported this finding. 249 Va. at 414-20, 457 S.E.2d at 105-08.

Unlike *Bottoms*, there was no evidence in the instant case that the children had been harmed as a result of living with their mother. Quite to the contrary, the record indicates that the children were well cared for and well-adjusted. Although it is possible that the children will experience social condemnation as a result of the mother's relationship with J.S., T.W. Mathews, the court-appointed psychologist, testified that the risk of such condemnation would not be eliminated by awarding custody of the children to their father. In addition, Mathews testified that there was no empirical evidence that suggested that children growing up in a homosexual environment would experience increased psychological problems. While the trial court must be commended for appointing a psychologist to evaluate the children, Mathews' testimony did not establish that the best interests of the children required a modification of custody. Therefore, standing alone, this factor was not a sufficient basis for modifying custody.

Nevertheless, the father argues that he was entitled to a change in custody based solely on the immorality of the mother's relationship with J.S. Citing *Jarrett v. Jarrett*, 78 Ill. 2d 337, 400 N.E.2d 421 (1979), he claims that the open and notorious nature of the mother's relationship endangered the moral well-being of the children and required a change in custody. Moreover, the father claims that, under *Jarrett*, he did not need to show that the mother's relationship had any tangible adverse affects on the children in order to meet his burden of proof.

In *Jarrett*, the supreme court held that open and notorious cohabitation by a custodial parent, standing alone, justified a change in custody. 78 Ill. 2d at 345-48, 400 N.E.2d at 424-25. According to the court, cohabitation was an affront to the statutorily expressed moral standards of the state and was thus injurious to the moral well-being of the children who were being raised in such an environment. Four years later, however, the supreme court made the following comment on its holding in *Jarrett*:

"The *Jarrett* case does not establish a conclusive presumption that, because a custodial parent cohabits with a member of the opposite sex, the child is harmed. No such presumption exists in this State. The court in *Jarrett* indicated that a custody award is not arrived at by pressing one lever and mechanically denying custody to one parent; rather all of the circumstances must be considered that affect the best interests of the child. [Citations.]" *In re Marriage of Thompson*, 96 Ill. 2d 67, 78, 449 N.E.2d 88, 93 (1983).

Therefore, to the extent that *Jarrett* held that open and notorious cohabitation necessarily requires a change in custody, that holding was

effectively reversed by the *Thompson* court. Further, *Thompson* makes it clear that Illinois courts cannot presume that a custodial parent's cohabitation is harmful to a child.

■ We recognize that cohabitation with a member of the same sex differs from cohabitation with a member of the opposite sex. However, Illinois' approach to child custody determinations is sexual-orientation neutral. *In re Marriage of Pleasant*, 256 Ill. App. 3d 742, 752, 628 N.E.2d 633, 640 (1993). Moreover, the clear import of the *Thompson* opinion is that Illinois courts should not adopt absolute rules that require a change in custody based on conduct of the custodial parent that does not impact the children. While the father argues that a court should not wait until actual harm has occurred before modifying a prior custody order (see *Jarrett*, 78 Ill. 2d at 348-49, 400 N.E.2d at 425), courts may modify custody only if the petitioning parent presents clear and convincing evidence to support his claim that the custodial parent's conduct endangers the moral well-being of the children. Because the father presented absolutely no evidence on this issue, he failed to meet his burden. Accordingly, we reject the father's argument.

The Illinois Marriage and Dissolution of Marriage Act clearly places great emphasis upon stability and continuity in custody arrangements. See *In re Marriage of Wycoff*, 266 Ill. App. 3d 408, 639 N.E.2d 897 (1994). Thus, the Act requires that a petitioner present clear and convincing evidence to support a modification of custody. In this case, the evidence established that the children were thriving in their mother's care. The only evidence that the children would be better off with their father was Mathews' opinion that there was a "slight" advantage to him having custody. The applicable standard, however, is not whether one arrangement is slightly better than another. The proposed arrangement must be shown by clear and convincing evidence to be necessary to serve the best interests of the children. Thus, the father has failed to meet his burden of proof.

For the foregoing reasons, the judgment of the circuit court of Tazewell County is reversed.

Reversed.

LYTTON and McCUSKEY, JJ., concur.