981 P.2d 134

**In re the Marriage of Frank HIGGINS, Petitioner–Appellee,**

v.

**Sara Deane HIGGINS, Respondent–Appellant.**

**No. 1 CA–CV 98–0284.**

Court of Appeals of Arizona.
Division 1, Department E.

May 27, 1999.

Ayers & Brown, P.C., by Harvey S. Brown, Phoenix, for petitioner-appellee.

Iacovina and Kayler, by Susan J. Kayler, Scottsdale, for respondent-appellant.

## OPINION

NOYES, Judge.

¶ 1 Sara Deane Higgins ("Mother") appeals from a dissolution decree in which she and Frank Higgins ("Father") were awarded joint custody of two daughters, Father was awarded *in loco parentis* visitation with Mother's son, and Father was made the residential parent of all three children. We conclude that the court had jurisdiction to award Father *in loco parentis* visitation with Mother's son. We also conclude that the court abused its discretion by basing its residential parent and visitation decisions on the fact that Mother lived with a boyfriend. Because the record contains no evidence to support

the court's conclusion that Mother's adulterous cohabitation had "a very serious and harmful detrimental effect upon the children," we reverse and remand for new trial on all issues relating to the children. The decree is otherwise affirmed.

## I.

¶ 2 Mother and Father were married in 1991. They had one daughter out of wedlock in 1989, and a second daughter in 1993. Also living with them was Mother's son, Michael, who was born in 1985. Michael thought that Father was his real father, but Mother and Father knew otherwise. The parties and the three children lived together until the parties separated in August 1995. In October 1995, Mother and the children moved in with Steven, a divorced man whom she had met at work. They were still living together two and a half years later, when this case came to trial.

¶ 3 In August 1996, Father filed a petition for dissolution of marriage. At that time, he was a 30–year–old service manager and Mother was a 29–year–old delicatessen manager/trainee. The petition avowed that the marriage had produced two children (the daughters). Father requested custody. Mother's response avowed that the children had lived primarily with her since the parties' separation, and she requested custody. Neither the petition nor the response mentioned Michael.

¶ 4 When Father petitioned for temporary custody of the daughters, Mother requested temporary joint custody, with her as primary residential parent and Father having reasonable visitation. After a hearing in November 1996, Commissioner Linda H. Miles awarded the parties temporary joint custody of the daughters, with Mother as primary residential parent and Father having weekend visitation. The order did not mention Michael, but Mother voluntarily granted Father the same visitation with Michael that the court granted him with the daughters.

¶ 5 As trial approached, Mother's counsel moved to withdraw because of Mother's lack of communication and failure to pay fees. The court granted the motion. At the February 1998 trial, Father had counsel and Mother did not.

¶ 6 Five witnesses testified at the half-day trial: Mother, her boyfriend, Father, his mother, and a co-worker of Father's. The record reflects that the parties were competent parents, that Father was managing his life better than Mother was hers, and that all three children were doing fine. Mother asked that she and Father have joint custody and that the temporary custody and visitation arrangements become permanent for all three children. Father asked to be primary residential parent of the daughters and to have *in loco parentis* visitation with Michael. The record supports the request of each party. Ordinarily, we would defer to the court's exercise of discretion on such a record. But this case became extraordinary when the court expressly based its residential parent and visitation decisions on a finding that Mother's adultery and cohabitation were seriously harmful to the children. This record contains no evidence to support that finding.

¶ 7 The only testimony regarding the harmful effects of adultery and cohabitation on these children was elicited from Father's mother by his counsel:

Q. Mrs. Higgins, you believe something about the best interests of the children; is that correct?

A. Yes, I do.

Q. Okay. What do you believe?

A. I think that the children being in a home where their mother is sleeping with another man isn't correct, not proper. And I don't believe that—

Q. Okay. And you feel that that is inappropriate?

A. Yes, sir, I do.

¶ 8 The court ruled from the bench. It rejected Mother's request to continue as primary residential parent, it designated Father as primary residential parent of the daughters, it ordered that the children be with Mother for a 72–hour continuous period each week, to include the days she was off work, and it extended those orders to Michael. The court also ordered Mother to marry her

boyfriend or evict him, if she wanted to see her children in her home:

It is a condition precedent to either parent having any of the children in his or her physical custody that there be no adult person of the opposite sex residing with that parent nor spending overnight with that parent while the children are in that parent's physical custody unless, that adult person of the opposite sex is related to that parent within the third degree of consanguinity or affinity.

What this means is that unless Mother marries—to illustrate, it applies to both parents. But to illustrate it, if Mother does not marry Steve Spencer, then she may not live with him while the children are there. And he may not spend overnight while they are there even during her access time, even though she is not the primary residential parent.

In other words, she will disqualify herself from having the children all 72 hours by having Steve Spencer there.

¶ 9 The court gave the following reasons for its decision:

It is appalling to the Court that Mother either ignores or is blind to the effect upon the children of her living in an adulterous relationship with Steve Spencer.

It is the opinion of the Court that this has a very serious and harmful detrimental effect upon the children. Adultery is a crime in Arizona, so is unlawful cohabitation. Never enforced, but it is a crime according to the statutes of this state. I say never enforced. Maybe it is on some occasions. But it is the opinion of the Court that this is a very serious factor pertaining to the well-being of the children.

The example that is set for them is very important.

¶ 10 While the court was still announcing the details of its decision, Mother asked for further explanation, and she disputed the testimony that she was "cold" to the children. The court again stressed how "very important" the adultery was to its decision:

MRS. HIGGINS: Excuse me. I don't understand how I can be losing residential custody of my children after two and a half years. I am not a cold mother and he knows it, and so does [Father's mother]. I have been very loving to those children.

. . . .

THE COURT: I think you're putting too much emphasis on Grandmother's—

MRS. HIGGINS: No, I don't think that I am.

THE COURT: Let me finish. It isn't Father's mother's testimony that was the turning point.

. . . .

THE COURT: I didn't make a finding that you're a cold mother.

MRS. HIGGINS: But—

THE COURT: If you would listen—

MRS. HIGGINS:—you find it appalling that I didn't say anything against it.

THE COURT: It's appalling that you live in adultery in their presence, yes, that is a very important factor.

MRS. HIGGINS: I have provided a home for those children for two and a half years. I have gave them love and support. I do not talk about their Father in front of them.

He does. He talks about the divorce. He talks about me. He talks about all of it in front of these small children. And I have kept it inside me and kept it inside me and not said anything. And that makes me cold because I don't want to emotionally disturb my children.

All three of those children love and care for Steve. And I am not a cold mother at all. And that is a flat out lie that you would say I have ever been ever cold to them.

THE COURT: Mother, don't thrash yourself on that point because it was not a significant point in the decision.

MRS. HIGGINS: Then what exactly was? The adultery? That makes me an unfit mother?

THE COURT: That was very important.

¶ 11 Mother filed a timely notice of appeal. She is now represented by counsel. Our jurisdiction is conferred by Arizona Revised

Statutes Annotated ("A.R.S.") section 12–2101(B) (1994).

## II.

■ ¶ 12 Mother represented herself at trial. One who represents herself in civil litigation is given the same consideration on appeal as one who has been represented by counsel. She is held to the same familiarity with court procedures and the same notice of statutes, rules, and legal principles as is expected of a lawyer. *See Smith v. Rabb*, 95 Ariz. 49, 386 P.2d 649 (1963); *Copper State Bank v. Saggio*, 139 Ariz. 438, 679 P.2d 84 (App.1983).

### A. In Loco Parentis Visitation

■ ¶ 13 Mother now argues that the court lacked jurisdiction to grant Father visitation with Michael. She cites *Finck v. Superior Court*, 177 Ariz. 417, 868 P.2d 1000 (App.1993), *approved in part*, 179 Ariz. 404, 880 P.2d 624 (1994), for the proposition that, in a dissolution action, the court has jurisdiction only over children common to the parties. She argues that A.R.S. section 25–415 (Supp.1998), which was enacted in response to *Finck*, does not apply because Father filed no petition pursuant to that statute.

¶ 14 The court's joint custody order made Father the primary residential parent of "the two minor children of the parties." The court then extended this order to Michael by finding as follows: "Both parties intend that Father's relationship with Michael continue and that the custody and access orders of the Court which are made as to the two minor children the parties have in common shall also apply to [Michael] so far as his schedule of time or access with each of the parties is concerned." [1]

¶ 15 The court intended its visitation order to include Michael, and the parties interpreted the order as doing that. We therefore review the order in that light. We begin by noting that neither A.R.S. section 25–403 nor section 25–408 (Supp.1998) (formerly A.R.S. sections 25–332 and 25–337 (1991)) confers jurisdiction on the court to award custody or visitation to anyone but a biological or adoptive parent. Because Father was not such a parent of Michael, the only source of jurisdiction regarding Father's visitation with Michael is A.R.S. section 25–415.[2]

¶ 16 The parties agreed, and the trial court found, that Father stood *in loco parentis* to Michael and that the whereabouts of the biological father were unknown for about ten years. If properly invoked, section 25–415

---

1. This finding granted Father far more *in loco parentis* visitation rights than he asked for, and it failed to acknowledge that Mother's consent to such visitation was based on her expectation that she would remain the primary residential parent of all three children. Immediately before the court announced its ruling, it asked Mother about her intentions regarding Michael:

THE COURT: Mother, are you stipulating that the Court's custody order include Michael?

MRS. HIGGINS: No, I am not. If it's, if the Court sees fit, then—but, no, I'm not asking for that.

Did I understand you correctly?
. . . .

THE COURT: Do you want Michael to keep the same schedule as the other children as far as which parent they are with, he is with?

MRS. HIGGINS: Yes. I think it's in his best interests not to change now. I think that would just further complicate the situation for him.

THE COURT: Not to change what?

MRS. HIGGINS: The situation that we've been going for the past two and a half years, and that is that he has been regarded just like the two girls in the same manner. So, yes, if you find—

[whereupon the court announced its ruling]

2. Section 25–415 provides in pertinent part as follows:

**C.** The superior court may grant a person who stands in loco parentis to a child ... reasonable visitation rights to the child on a finding that the visitation is in the child's best interests and that any of the following is true:

1. One of the legal parents is deceased or has been missing at least three months.

2. The child's legal parents are not married to each other at the time the petition is filed.

3. [T]here is a pending proceeding for dissolution of marriage or for legal separation of the legal parents at the time the petition is filed.

**D.** A grandparent, a great-grandparent or a person who stands in loco parentis to a child may bring a proceeding for visitation rights with a child by filing a verified petition in the county in which the child is permanently resident or is found.

A.R.S. § 25–415 (Supp.1998), added by 1997 Ariz.Sess.Laws Ch. 295, § 1.

gave the court jurisdiction to grant Father visitation with Michael. We conclude that the court did not err in deeming the statute properly invoked. Father raised the issue in his pretrial statement, and Mother was prepared to litigate the issue.

¶ 17 We hold that when a party seeking *in loco parentis* visitation is in a dissolution action with the child's parent, and when the other statutory prerequisites are met, section 25–415 jurisdiction is invoked by timely notice in the dissolution action. Father did not need to file a separate petition to invoke the court's jurisdiction pursuant to section 25–415.

■ ¶ 18 The question might be asked whether a grant of visitation pursuant to section 25–415 is *per se* unreasonable if it makes the *in loco parentis* party the primary residential parent of the other party's child. We do not answer that question for all cases, but we do hold that such a broad order was a clear abuse of discretion in this case. The order regarding Michael was based on the order regarding the daughters, and that order was erroneously based on the court's personal opinions about adultery and cohabitation.

### B. Adultery and Cohabitation

■ ¶ 19 The record contains no evidence to support a finding that Mother's adultery and cohabitation had, in the court's words, a "very serious and harmful detrimental effect upon the children." Father's mother is entitled to her belief that Mother should not be living and sleeping with another man, and the court is entitled to that belief, but such personal belief is not competent evidence about the effects of that relationship on these children.

¶ 20 Because it was not based on any evidence, the court's finding regarding adultery and cohabitation was perhaps an effort to take judicial notice pursuant to Rule 201(b), Arizona Rules of Evidence, which provides:

**(b) Kinds of Facts.** A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

■ ¶ 21 We hold that a claim that children are being very seriously harmed by a parent's adulterous cohabitation is not one for which the answer is so generally known or accurately and readily determined that it can be proved by judicial notice. In a modern-day domestic relations proceeding, a party making that claim has the burden of proving it by competent evidence regarding the real-life facts and circumstances of the actual case. *Cf.* Diane M. Allen, *Propriety of Provision of Custody or Visitation Order Designed to Insulate Child from Parent's Extramarital Sexual Relationships*, 40 A.L.R.4th 812, 816 (1985 and Supp.1998) ("Except for a few states wherein the courts continue to show a punitive attitude toward a divorced person's extramarital sexual relationships, most of the cases ... indicate a trend toward careful evaluation of the impact of such a relationship before approving limitations on custody or visitation which severely restrict a parent's associations.").

■ ¶ 22 The court felt so strongly about cohabitation that it ordered Father not to do it either, even though it was undisputed that Father was not then doing it; he was living with his mother. We respectfully conclude that, absent extraordinary circumstances that were not proved here, the domestic relations court has no authority to dictate the terms of future relationships for the parties or to tell them with whom they can and cannot live if they want to see their own children in their own home.

■ ¶ 23 The court was correct that adultery and cohabitation are crimes. Each is a class 3 misdemeanor, the maximum penalty for which is thirty days in jail and a $500 fine. *See* A.R.S. §§ 13–1408, 1409, 707, and 802 (1989).[3] When making general pro-

---

3. Sections 13–1408 and 13–1409 provide as follows:

**§ 13–1408. Adultery; classification; punishment; limitation on prosecution**

nouncements about these crimes, the court must recognize that the legislature has determined that adultery and cohabitation are minor offenses in today's society. When deciding custody and visitation issues, the court can certainly consider a parent's relationships with others, and criminal conduct by a parent. But before the court can conclude that criminal conduct has "a very serious and harmful detrimental effect upon the children," the record must contain evidence to that effect; something more than the fact that the parent could be convicted of a class 3 misdemeanor if the crime was ever prosecuted.

¶ 24 Our dissenting colleague's views on adultery and cohabitation correspond with those of the trial court. We respect those views, but we do not agree that they provide a legal basis for custody and visitation orders in domestic relations court. The one case cited by the dissent is *Jarrett v. Jarrett*, 78 Ill.2d 337, 36 Ill.Dec. 1, 400 N.E.2d 421 (1979), which is the one case cited by Father on this subject. *Jarrett* has been limited by subsequent cases in Illinois. *See, e.g., In re Marriage of Thompson*, 96 Ill.2d 67, 70 Ill. Dec. 214, 449 N.E.2d 88, 93 (1983) ("The *Jarrett* case does not establish a conclusive presumption that, because a custodial parent cohabits with a member of the opposite sex, the child is harmed. No such presumption exists in this State."); *In re Marriage of R.S.*, 286 Ill.App.3d 1046, 222 Ill.Dec. 498, 677 N.E.2d 1297, 1303 (1996) ("[T]o the extent that *Jarrett* held that open and notorious cohabitation necessarily requires a change in custody, that holding was effectively reversed by the *Thompson* court.").

¶ 25 Because the record contains no evidence that Mother's adulterous cohabitation had a very seriously harmful effect on her children, the court abused its discretion in making such a finding. That erroneous finding clearly affected the outcome of the residential parent and visitation issues. The

court said more than once that it was "appalled" by Mother's adulterous cohabitation, and that her adultery was "very important" to its decision. The dissent finds that the boyfriend was abusive, but the trial court did not make that finding, and the trial court's "condition precedent" order actually pressured Mother to marry the boyfriend.

¶ 26 Because a new trial is necessary on all issues relating to the children, we will discuss other evidentiary issues that were raised in this appeal and are likely to arise in the new trial.

### C. Hearsay from Children

¶ 27 Father testified that his mother told him that Michael told her that Mother slapped Michael once. Mother objected to this double hearsay. The trial court let it in.

> THE COURT: Statements to children—yes, it is hearsay. But statements by children I usually admit in a trial of this nature because I do not want to bring the children in to testify in front of their parents. And also their ages being 9 and 5, I think … minimizes the likelihood of them, of them planning a statement for this trial.

Father also testified that Michael told him that Mother's boyfriend spanked Jessica once, that the "children" told him that the boyfriend threw a VCR into a wall once, and that two of the children told him that the boyfriend drank a big beer every day. Mother did not object to all of this, but the court's explanation for overruling the first objection was a message that further objections would be futile. Mother did not waive the issue by failing to object more often. Father does not argue otherwise.

¶ 28 Mother argues that the court abused its discretion in its blanket admission of hearsay from children. We agree. Rule 801, Arizona Rules of Evidence, provides in part:

**A.** A married person who has sexual intercourse with another than his or her spouse, and an unmarried person who has sexual intercourse with a married person not his or her spouse, commits adultery and is guilty of a class 3 misdemeanor. When the act is committed between parties only one of whom is married, both shall be punished.

**B.** No prosecution for adultery shall be commenced except upon complaint of the husband or wife.

**§ 13–1409. Open and notorious cohabitation or adultery; classification**
A person who lives in a state of open and notorious cohabitation or adultery is guilty of a class 3 misdemeanor.

**(a) Statement.** A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.

. . . .

**(c) Hearsay.** "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Rule 802, Arizona Rules of Evidence, provides:

Hearsay is not admissible except as provided by applicable constitutional provisions, statutes, or rules.

¶ 29 Father does not argue that the challenged statements were non-hearsay, or admissible under an exception to the hearsay rule. Father instead asserts that hearsay from children is commonly admitted in domestic relations court. Even if true, that assertion is not a recognized exception to the hearsay rule. We understand and agree with the court's reluctance to have children testify in their parents' domestic relations trial, but the hearsay rule does apply there. *See Atkinson v. Atkinson,* 2 Ariz.App. 1, 3, 405 P.2d 919, 921 (1965) ("While it is commendable that neither parent desired to subject their children to the difficult experience of being witnesses in a jury trial relating to the [parents' property settlement agreement], this fact did not make hearsay evidence admissible."). Although the court, particularly when sitting without a jury, has broad discretion in application of the hearsay rule, the record in this case reflects no exception by which the hearsay from these children could be properly admitted into evidence over objection. *See generally* MORRIS

K. UDALL ET AL., ARIZONA PRACTICE: LAW OF EVIDENCE §§ 121, 126, 136, 137 (3d ed.1991).

### D. Attorneys' Fees

¶ 30 Mother requests an award of attorneys' fees pursuant to A.R.S. sections 25–324 (Supp.1998) and 25–403(P) (Supp. 1998).[4] Father requests an award of attorneys' fees pursuant to section 25–324. Mother prevails on this appeal and is the party with fewer financial resources. We therefore award Mother some attorneys' fees, in an amount to be established according to Rule 21(c), Arizona Rules of Civil Appellate Procedure. If the financial condition of a party has materially changed since the decree of dissolution, that party should file a current financial affidavit.

### III.

¶ 31 The decree of dissolution is affirmed, except that all orders relating to the children are reversed and remanded for a new trial.

Concurring: JEFFERSON L. LANKFORD, Judge.

THOMPSON, Presiding Judge, dissenting.

¶ 32 The majority espouses a hedonistic ethic that is at odds with the declared law of this state. Our criminal code serves to "proscribe conduct that unjustifiably and undeniably causes or threatens substantial harm to individual or public interests...." A.R.S. § 13–101(1). Adultery is a crime, obviously declared so by our elected representatives because it strikes directly at the heart of family relations. It violates no natural right nor any positive law that the trial court awarded custody to the father here in part because the mother, still married, decided to

---

4. The relevant portion of section 25–324 provides:

The court from time to time, after considering the financial resources of both parties and the reasonableness of the positions each party has taken throughout the proceedings, may order a party to pay a reasonable amount to the other party for the costs and expenses of maintaining or defending any proceeding under this chapter or chapter 4, article 1 of this title. For the purpose of this section costs and expenses may include attorney's fees, deposition costs and other reasonable expenses as the court finds neces-

sary to the full and proper presentation of the action, including any appeal.
Section 25–403(P) provides:

In a proceeding regarding sole custody or joint custody, either party may request attorney fees, costs and expert witness fees to enable the party with insufficient resources to obtain adequate legal representation and to prepare evidence for the hearing. If the court finds there is a financial disparity between the parties, the court may order payment of reasonable fees, expenses and costs to allow adequate preparation.

transgress basic moral and legal precepts by engaging in an adulterous relationship with an abusive [5] male. The trial judge properly determined that the environment which the mother offered the parties' children was not desirable,[6] and there is no abuse of discretion in the observation that it is "appalling" that she has decided to live in adultery with this rogue male in the childrens' presence.

¶ 33 Statutes like A.R.S. sections 13–1408 and 13–1409 express "relevant standards of conduct" and seek to " 'strengthen and preserve the integrity of marriage and safeguard family relationships.' " *Jarrett v. Jarrett*, 78 Ill.2d 337, 36 Ill.Dec. 1, 400 N.E.2d

5. Mother admitted the boyfriend hit her.

6. The boyfriend's commission of domestic violence is expressly deemed contrary to the childrens' best interests by statute. *See* A.R.S. § 25–403(B).

7. While subsequent cases make it clear that *Jarrett* does not support any conclusive presumption

421, 423–24 (1979), *cert. denied*, 449 U.S. 927, 101 S.Ct. 329, 66 L.Ed.2d 155 (1980), *reh'g denied*, 449 U.S. 1067, 101 S.Ct. 797, 66 L.Ed.2d 612 (1980).[7] Such statutes reflect a legislative determination that "open fornication represents a grave[ ] threat to public morality. . . ." *Id.* 36 Ill.Dec. 1, 400 N.E.2d at 424. I would affirm.

about the fitness of a parent living in adultery, the case stands unchallenged in our jurisprudence for the notion that where adultery is considered a crime it may also be considered a negative factor in a custody determination. My personal views are not relevant and not offered here. I am guided by the legislature's declaration of public policy.