NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE DEPENDENCY AS TO A.C.

No. 1 CA-JV 22-0202
FILED 3-7-2023

Appeal from the Superior Court in Maricopa County
No. JD38480
The Honorable Pamela S. Gates, Judge

**AFFIRMED**

COUNSEL

Edward B., Peoria
*Appellant*

Arizona Attorney General's Office, Mesa
By Emily M. Stokes
*Counsel for Appellee Department of Child Safety*

_____

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the court, in which Presiding Judge Samuel A. Thumma and Judge Anni Hill Foster joined.

_____

**H O W E**, Judge:

¶1        Edward B. ("Father") appeals from the juvenile court's order finding his child, A.C., dependent. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2        We view the facts in the light most favorable to sustaining the juvenile court's order. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 2 ¶ 2 (2016). Father and Graciela M. ("Mother") are the biological parents of A.C., born in May 2021.[1] In December 2021, the Department of Child Safety ("DCS") received a report alleging that A.C. had bruises on his face and back. Mother stated that A.C. had fallen down the stairs, but later admitted that she had dropped A.C. because she was intoxicated. In January 2022, the Phoenix Police Department received a 9-1-1 call about a fight between Mother and Father in an alleyway. The third-party caller observed Mother punching Father and pushing A.C.'s stroller, causing A.C. to fall to the ground. Officers responded to the 9-1-1 call, located the parents, and interviewed them. Mother stated that Father struck her about 20 times, and one of the strikes hit A.C. in the face. She also stated that Father tried to take A.C. from her arms, causing A.C. to fall on the ground during the struggle.

¶3        Father stated that he confronted Mother about her drug use, and she became angry at him. Police officers saw that A.C. had injuries on his face and appeared dazed, and they took him to a hospital. A medical examination determined that A.C.'s injuries were likely caused by non-accidental blunt force trauma. After the incident, A.C. remained in Mother's custody, but about a week later, Mother dropped A.C. off at Father's house.

¶4        DCS petitioned the juvenile court for dependency, alleging that A.C. was dependent as to Father due to abuse and neglect and seeking

_____

[1]        Mother is not a party to this appeal; the juvenile court also found A.C. dependent as to her.

an order placing A.C. in DCS's custody. The juvenile court granted the petition and DCS placed A.C. in a foster home.

¶5        DCS offered Father services, including paternity testing, parenting classes, domestic-violence counseling, visitation, and drug testing. Father participated in paternity testing, one rule-out drug test, and visitation. However, he did not participate in the other services because he claimed that he did "not have a [] case" with DCS. In August 2022, the juvenile court held a contested dependency hearing.

¶6        At the hearing, Father testified that he was not married to Mother and was never in a relationship with her. He was not present during A.C.'s birth because Mother lived in Nevada, and he was incarcerated in Arizona. Although he was released from incarceration in June 2021—about a month after A.C. was born—he did not start seeing A.C. until November 2021 when Mother moved back to Arizona. Father never petitioned the family court for parenting time or legal decision-making.

¶7        Father admitted he learned of Mother's drug use around December 2021. When Mother did not want to work with Father to improve her living situation, he called DCS and reported her drug use. Then, during the January 2022 incident, he confronted her about the drug use but did not hit her. He testified that A.C. was present during the January 2022 incident and had fallen out of the stroller. After the incident, he did not check on A.C. because the police told him to not contact Mother. He also testified that he possessed the basic parenting skills to take care of A.C. if he was returned to him. Finally, he testified that he would do counseling if the juvenile court ordered it, but he did not feel like he had done anything wrong and did not need it.

¶8        The DCS case manager testified that the primary concern was the ongoing domestic violence, and that Father was unable to provide care and control for A.C. The case manager also testified that Father did not agree to participate in domestic-violence counseling. Finally, the case manager testified that DCS wanted Father to participate in domestic-violence counseling even if he was the victim of the January 2022 incident and not the aggressor. The case manager acknowledged, however, that Father was on probation because of a domestic-violence conviction and through it was participating in domestic-violence classes.

¶9        The juvenile court found that DCS had proved that A.C. was dependent as to Father by a preponderance of the evidence. It found that domestic violence was a substantiated concern and unresolved threat to

A.C. It also found Father to be "a relatively unreliable reporter of information." It therefore adjudicated A.C. dependent as to Father. Father timely appealed.

**DISCUSSION**

**¶10**         Father's opening brief lacks citations to relevant authorities, statutes, and portions of the record. *See* Ariz. R. Civ. App. P. 13(a). Father's failure to comply with these rules limits our ability to evaluate his arguments or otherwise address his claims. *See*, *e.g.*, *In re U.S. Currency in Amount of $26,980.00*, 199 Ariz. 291, 299 ¶ 28 (App. 2000) (refusing to consider unsupported and undeveloped arguments). Although Father is a non-lawyer representing himself, he is held to the same standards as a qualified attorney. *Higgins v. Higgins*, 194 Ariz. 266, 270 ¶ 12 (App. 1999). Nevertheless, because we prefer to decide cases on the merits, and the best interests of the child are at issue, we will attempt to discern and address the substance of Father's arguments. *Clemens v. Clark*, 101 Ariz. 413, 414 (1966).

**¶11**         We review an order adjudicating a child dependent for an abuse of discretion, deferring to the juvenile court's ability to weigh and analyze the evidence. *Louis C. v. Dep't of Child Safety*, 237 Ariz. 484, 488 ¶ 12 (App. 2015). We will disturb a dependency adjudication only if no reasonable evidence supports it. *Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 50 ¶ 13 (App. 2016).

**¶12**         A dependent child is one "[i]n need of proper and effective parental care and control and who has . . . no parent or guardian willing to exercise or capable of exercising such care and control"; "not provided with the necessities of life, including adequate food, clothing, shelter or medical care"; or whose "home is unfit by reason of abuse, neglect, cruelty or depravity of a parent, a guardian or any other person having custody or care of that child." A.R.S. § 8–201(15)(a)(i), (ii), (iii). "Neglect" is defined as the "inability or unwillingness of a parent, guardian or custodian of a child to provide that child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare." A.R.S. § 8–201(25)(a). Whether a child is dependent focuses on the circumstances existing at the time of the adjudication. *Shella H.*, 239 Ariz. at 50 ¶ 12. DCS has the burden of proving the allegations of a dependency petition by a preponderance of the evidence. *See* A.R.S. § 8–844(c)(1); *Shella H.*, 239 Ariz. at 50 ¶ 13.

**¶13**         Reasonable evidence supports the juvenile court's order. In January 2022, Father was involved in domestic violence with Mother,

during which A.C. fell to the ground. After the incident, he did not check on A.C., claiming that he was told not to contact Mother. Also, at the time of the hearing, Father was on probation because of a domestic-violence conviction. Yet Father resisted DCS's request that he participate in domestic-violence counseling and did not think he needed counseling. Father also knew of Mother's drug use for about a month before DCS got involved. Although he reportedly informed DCS of Mother's drug use, he did not remove or take any further action to protect A.C. from her care, despite his concern about her drug use. Thus, because the record shows that domestic violence was a substantiated concern and unresolved threat to A.C. and that Father failed to appropriately care and supervise A.C., sufficient evidence supports the juvenile court's finding that A.C. was dependent due to Father's neglect. *See Shella H.*, 239 Ariz. at 51 ¶ 16 ("[D]omestic violence need not be continuous or actively occurring at the time of the adjudication hearing to support a finding of dependency on these grounds; the substantiated and unresolved threat is sufficient.").

**¶14**     Father argues that DCS's reports included "false" information. But we defer to the juvenile court's ability to weigh and analyze the evidence as the trier of fact. *Jesus M. v. Ariz. Dep't. of Econ. Sec.*, 203 Ariz. 278, 282 ¶ 12 (App. 2002). And in the exercise of this function, the juvenile court explicitly noted that it found Father to be "a relatively unreliable reporter of information." Thus, Father has not shown that the juvenile court erred in finding A.C. dependent as to him.

**CONCLUSION**

**¶15**     For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:     AA