# Illinois Official Reports

## Appellate Court

---

### *Blumenthal v. Brewer*, 2014 IL App (1st) 132250

---

| | |
|---|---|
| Appellate Court Caption | JANE E. BLUMENTHAL, Plaintiff-Appellee, v. EILEEN M. BREWER, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-13-2250 |
| Filed | December 19, 2014 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CH-48730; the Hon. LeRoy K. Martin, Judge, presiding. |
| Judgment | Vacated and remanded with directions. |
| Counsel on Appeal | Angelika Kuehn, of Angelika Kuehn Law Offices, of Oak Park, and Shannon Minter, *pro hac vice*, Amy Whelan, *pro hac vice*, and Cathy Sakimura, *pro hac vice*, all of National Center for Lesbian Rights, of San Francisco, California, for appellant.<br><br>Reuben A. Bernick, of Chicago, for appellee.<br><br>John A. Knight, of Robert Baldwin Foundation of ACLU, Inc., and Camilla B. Taylor, of Lambda Legal Defense & Education Fund, Inc., both of Chicago, and Nancy D. Polikoff, of American University Washington College of Law, of Washington, D.C., for *amici curiae*. |

Panel JUSTICE McBRIDE delivered the judgment of the court, with opinion
Justices Gordon and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    In 2010, Jane E. Blumenthal filed suit to partition a Chicago home she owned with Eileen M. Brewer, her former domestic partner of 26 years. Brewer counterclaimed for various remedies, including to receive sole title to the property so that the couple's overall assets would be equalized after she stayed at home with the couple's three children while Blumenthal was the family's breadwinner. The trial court dismissed Brewer's counterclaims as factually deficient, relying upon a 1979 decision, *Hewitt v. Hewitt*, 77 Ill. 2d 49, 394 N.E.2d 1204 (1979). In *Hewitt*, the court rejected on public policy grounds a woman's suit to divide assets she accumulated with a man during a 15-year relationship in which they lived together, had three children together, but never married. Brewer appeals, primarily contending that *Hewitt* has been implicitly overruled by subsequent legislation favorable to same-sex domestic partnerships. American Civil Liberties Union of Illinois and Lambda Legal Defense & Education Fund, Inc., have filed an *amici curiae* brief in support of Brewer.

¶ 2    When a party presents a motion to dismiss a pleading or count as factually deficient, the court determines whether there are actually sufficient allegations that, if proven, could entitle the complainant to relief. *In re Marriage of Centioli*, 335 Ill. App. 3d 650, 781 N.E.2d 611 (2002); 735 ILCS 5/2-615 (West 2010). A motion to dismiss for factual insufficiency is governed by section 2-615 of the Code of Civil Procedure. *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 172 Ill. App. 3d 718, 720, 527 N.E.2d 97, 100 (1988); 735 ILCS 5/2-615 (West 2010). The court must accept all well-pled facts in the complaint as true and draw reasonable inferences from those facts that are favorable to the complainant. *HPI Health Care Services*, 172 Ill. App. 3d at 720-21, 527 N.E.2d at 100; *Centioli*, 335 Ill. App. 3d 650, 781 N.E.2d 611. Because the issue presented is a question of law, a reviewing court applies the *de novo* standard when addressing a dismissal pursuant to section 2-615. *Centioli*, 335 Ill. App. 3d 650, 781 N.E.2d 611; 735 ILCS 5/2-615 (West 2010).

¶ 3    The pleading at issue here relates the following. Brewer and Blumenthal became domestic partners in 1981 or 1982, while they were pursuing graduate studies at the University of Chicago. At no point during their ensuing relationship were same-sex couples legally entitled to marry in Illinois. The pair, however, exchanged rings as symbols of their lifelong commitment to each other and presented themselves to their families and friends as a committed couple.

¶ 4    Brewer subsequently attained a law degree from Harvard Law School and Blumenthal attained a medical degree from an undisclosed school.

¶ 5    After law school, Brewer gave birth to a child in 1990 and a second child in 1992. Blumenthal gave birth to a child in 1993. The couple gave all three children the same last name.

¶ 6    To best care for their children, the couple deliberately allocated their work and family responsibilities. Brewer stayed home for a while as the children's primary caregiver and then

- 2 -

pursued employment in the public sector where she had regular work hours and no travel requirements. And, as the stay-at-home parent, Brewer spent the greater amount of time in other domestic tasks, such as supervising home repairs, grocery shopping, and paying the household bills. This arrangement enabled Blumenthal to devote time to her medical career and become the family's primary breadwinner. "As a consequence of the allocation of their respective responsibilities in the family following the birth of their children, Blumenthal came to earn two to three times as much annually as Brewer"; however, the couple comingled their assets throughout their 26-year relationship. One such asset was the real estate that was central to Blumenthal's partition claim and Brewer's counterclaim. The women had jointly purchased a home on Kimbark Avenue in Chicago's Kenwood-Hyde Park neighborhood in 1999, when their children were ages six, seven, and nine. They chose to reside in this area due to the proximity of good schooling that was supportive of the children of same-sex domestic partners. They also jointly purchased investment properties outside of Illinois. In addition, between 2000 and 2008, physician Blumenthal purchased an ownership interest in a six-doctor medical practice. On information and belief, the funds for this investment came from the couple's joint account. Blumenthal continues to practice medicine with that group of physicians. In 2002, attorney Brewer was first elected as a judge in the circuit court of Cook County and she continues in that position. "It was [the couple's] understanding that Brewer would not suffer any financial disadvantage from the way in which [they] allocated their parenting and career responsibilities" and "it was [always] their practice to share equally the same home, food, automobiles, vacations, vacation property, and to the extent they could, savings and investments."

¶ 7   The couple also took legal steps because of their lifelong commitment. In 2002, they went through the procedures to cross-adopt their three children, including undergoing a home study. Later that same year, the circuit court of Cook County granted their jointly filed cross-adoption petition. In 2002, the Cook County board of commissioners created the "Domestic Partner Registry" so that same-sex couples in Chicago and suburban Cook County could formally document their partnerships. The local ordinance which created the registry stated in relevant part: "Our society has created diverse living arrangements and an expanded concept of the family unit"; "Many persons today live as families in enduring, committed relationships other than legal marriages"; "The County of Cook has an interest in supporting all caring, committed and responsible family units"; "The County also recognizes that it is in the public interest for persons in committed relationships and who share common households to be able to register those relationships formally"; "Over 5,000 companies, foundations, unions, and nonprofit organizations have domestic partnership benefit programs"; "Cook County would be providing a service to those companies, foundations, unions and non-profits in Cook County by creating an official depository of information with a government agency"; and "A government-issued certificate of registered domestic partnership makes it easier for small businesses to provide benefits to all types of families." Cook County Ordinance No. 03-O-18 (approved July 1, 2003). Blumenthal and Brewer added their names to the county roll in 2003. In registering, they signed an affidavit stating in part,

> " 'We, the undersigned, being duly sworn, do declare that on or before January in the year 1981 we agreed to live as domestic partners, and that we have so lived since that time. We further state that we have since that time held ourselves out to be each other's sole domestic partner and that neither of us is married. To fulfill the requirements established by Cook County for benefits coverage we further attest that:

*** We are each other's sole domestic partner, responsible for each other's common welfare ***. [Also, we jointly own a residence, and have a joint credit card and joint checking account, and Blumenthal is the primary beneficiary of the will executed by Cook County employee Brewer.]' "[1]

¶ 8 In 2005, when Illinois neither provided for same-sex marriage nor recognized out-of-state same-sex marriages, Blumenthal and Brewer took out a marriage license in Massachusetts. They did not, however, marry in that state.

¶ 9 In January 2008, when the children were teenagers, Blumenthal unilaterally ended her domestic partnership with Brewer by vacating the family home. The records of this court indicate that in a separate action, the former partners resolved issues of custody, child support, and responsibility for expenses such as the children's college costs. *In re Custody of J.M.B.*, 2013 IL App (1st) 122142-U. By 2011, all three children were emancipated adults.

¶ 10 Blumenthal contributed some of the costs of maintaining the residence in 2008, but as of January 2009, Brewer became solely responsible for the property's upkeep and its mortgage payments, real estate taxes, and insurance. Between 2008 and 2013, Brewer spent in excess of $215,000 on the property. She also contributed at least 15 hours per week of her personal time to the property's care. Brewer contributed more money than Blumenthal despite the fact that Blumenthal's net worth, without including inheritances, exceeded and exceeds Brewer's net worth by more than $500,000. Furthermore, due to the disproportionate time and attention that Blumenthal was able to give to her career during the relationship, Blumenthal has not only a valuable medical practice, but also more income and savings than Brewer.

¶ 11 Based on these allegations, Brewer seeks the imposition of a constructive trust over the Kimbark Avenue residence to prevent unjust enrichment arising from Blumenthal's greater net worth at the end of the relationship (count I) or, in the alternative, a partition which adjusts for Brewer's sole financial liability for the property since 2009 (count II, count IV) and which adjusts for the value of Brewer's personal hours improving the property since 2008 based on the theory of *quantum meruit* (count V). Brewer also seeks the imposition of a constructive trust over the annual net earnings or the sale of Blumenthal's share of her medical practice to prevent unjust enrichment or, in the alternative, restitution of the funds that, on information and belief, Blumenthal took from the couple's joint account between 2000 and 2008 to buy into the six-doctor practice (count III).

---

[1]After the Illinois legislature provided for civil unions, the county's domestic partners registry was phased out. The local ordinance accomplishing that change states:

"Phasing out of domestic partnerships.

(a) In light of the enactment of Public Act 96-1513, the Illinois Religious Freedom Protection and Civil Union Act, effective June 1, 2011, notwithstanding any other provision of this Ordinance, or other law, no new domestic partnerships shall be registered after May 31, 2011.

(b) The issuance of a Civil Union license to joint applicants who are registered as domestic partners to one another shall terminate their domestic partnership when the certificate of Civil Union is returned to the County Clerk pursuant to section 40 of the Illinois Religious Freedom Protection and Civil Union Act. No additional filing pursuant to section 42-75 of this Ordinance shall be required to effect the termination of the domestic partnership between them." Cook County Ordinance No. 11-O-34, § 42-79 (approved Mar. 15, 2011).

¶ 12 Generally speaking, the legal doctrine of unjust enrichment describes a recovery for the value of a benefit retained to the loss of another when there is no contractual relationship between them but when "on the grounds of fairness and justice, the law compels the performance of a legal and moral duty to pay" for that benefit. 66 Am. Jur. 2d *Restitution and Implied Contracts* § 3 (2013). Put another way, the doctrine does not require that there be any express promise between the parties. 66 Am. Jur. 2d *Restitution and Implied Contracts* § 3 (2013). Instead, unjust enrichment implies a contract between the parties so that one party is not allowed to unfairly enrich herself at the expense of the other party. 66 Am. Jur. 2d *Restitution and Implied Contracts* § 3 (2013). Terminology such as "fairness and justice" may suggest that the doctrine provides an equitable remedy; however, an unjust enrichment claim is an action at law and is sometimes known as a contract implied at law, a quasi-contract, restitution, or *assumpsit*. *HPI Health Care Services*, 172 Ill. App. 3d at 734, 527 N.E.2d at 109 ("Although there has been considerable confusion on the matter, unjust enrichment is not an equitable action."). In the Illinois courts, in order to state a cause of action for unjust enrichment, one need allege only "that there was an unjust retention of a benefit, including money, by one party to the detriment of another party, against the fundamental principles of justice, equity, and good conscience." *HPI Health Care Services*, 172 Ill. App. 3d at 735, 527 N.E.2d at 107; *Kenneke v. First National Bank of Chicago*, 65 Ill. App. 3d 10, 12, 382 N.E.2d 309, 311 (1978). (An alternative branch of unjust enrichment not at issue here requires allegations of unlawful or improper conduct such as fraud, duress, or undue influence. See *Gagnon v. Schickel*, 2012 IL App (1st) 120645, ¶ 25, 983 N.E.2d 1044.)

¶ 13 Also relevant is that restitution is an equitable remedy and the basis of liability is unjust enrichment. *Independent Voters of Illinois v. Illinois Commerce Comm'n*, 117 Ill. 2d 90, 98, 510 N.E.2d 850, 854 (1987).

¶ 14 To recover under the theory of *quantum meruit*, the plaintiff must prove that: (1) she performed a service to benefit the defendant, (2) she did not perform this service gratuitously, (3) defendant accepted this service, and (4) no contract existed to prescribe payment for this service. *Canel & Hale, Ltd. v. Tobin*, 304 Ill. App. 3d 906, 710 N.E.2d 861 (1999).

¶ 15 When Brewer prepared to file a counterclaim containing these allegations and claims, Blumenthal filed a legal memorandum indicating that Illinois public policy, as stated in *Hewitt*, does not allow for implied contract claims based on nonmarital cohabitation. *Hewitt*, 77 Ill. 2d 49, 394 N.E.2d 1204. Blumenthal further argued that even if Illinois recognized claims between unmarried domestic partners, Brewer's allegations were factually deficient. After further briefing and oral arguments, the trial judge granted Brewer leave to file her proposed amended counterclaim, treated Blumenthal's memo as a section 2-615 motion to dismiss Brewer's pleading (735 ILCS 5/2-615 (West 2010)), and entered the dismissal ruling now on appeal. The judge's written order states, "this Court considers itself compelled to enter this [dismissal] order because of [*Hewitt*]." There is no indication in the order or the parties' appellate briefs that the trial judge considered Blumenthal's arguments that the pleading was factually deficient. The order, however, includes language allowing for immediate appeal pursuant to Supreme Court Rule 304(a), and after the judge denied Brewer's amended motion for reconsideration of the dismissal, Brewer filed this appeal. Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010).

¶ 16 Brewer now argues that the trial court's reliance on the 35-year-old *Hewitt* opinion was misplaced because the legislative policies underlying that decision either no longer exist or have been modified substantially. *Hewitt*, 77 Ill. 2d 49, 394 N.E.2d 1204. She contends it was

public policy to treat unmarried relationships as illicit, but in the decades since *Hewitt* was decided, the Illinois legislature has repealed the criminal prohibition on nonmarital cohabitation, prohibited differential treatment of marital and nonmarital children, adopted no-fault divorce, established civil unions for both opposite-sex and same-sex partners, and extended other significant protections to nonmarital families. Brewer contends that in light of these profound changes, *Hewitt*'s categorical restriction on claims by unmarried partners has been implicitly overruled. She concludes that *Hewitt*'s holding has no basis in the current law and that its continued application would directly contravene the current policy of this state.

¶ 17    Blumenthal responds that *Hewitt* was not based on a legislative policy to stigmatize or penalize cohabitants for their relationship, but was instead based on a statute that abolished common law marriage in this jurisdiction and is now known as section 214 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/214 (West 2010) ("Common law marriages contracted in this State after June 30, 1905 are invalid.")). Blumenthal contends that regardless of the many legislative changes that Brewer has highlighted and discussed so thoroughly in her appellate brief, the Illinois legislature has never changed its categorical abolition of common law marriage. Blumenthal contends that *Hewitt* is still good law because it gives effect to Illinois's ongoing public policy that individuals acting privately by themselves cannot create a marriage relationship and that the government must be involved in the creation of that bond. Blumenthal concludes that conferring the benefits of a legal marriage on her relationship with Brewer would essentially be resurrecting common law marriage in Illinois and overruling *Hewitt* and subsequent cases that note that change, if any, must come from the legislature.

¶ 18    We find some merit in both parties' arguments. We agree with Brewer that *Hewitt* is based on public policy considerations and we agree with Blumenthal that *Hewitt* gives effect to the legislature's ban on common law marriage. Nevertheless, for the following reasons, we find that the public policy to treat unmarried partnerships as illicit no longer exists, that Brewer's suit is not an attempt to retroactively create a marriage, and that allowing her to proceed with her claims against her former domestic partner does not conflict with this jurisdiction's abolishment of common law marriage.

¶ 19    In *Hewitt*, Victoria Hewitt initially filed a complaint to divorce Robert Hewitt, but then acknowledged that the parties never took out a marriage license or took part in a marriage ceremony. *Hewitt*, 77 Ill. 2d at 52, 394 N.E.2d at 1205. Her amended complaint or the parties' testimony indicated that after Robert and Victoria conceived a baby while they were college students in 1960, Robert told Victoria they would share their assets and were husband and wife without need of a formal ceremony, they immediately announced to their parents they were married, and for the next 15 years they held themselves out as a married couple. *Hewitt*, 77 Ill. 2d at 53, 394 N.E.2d at 1205. During those years, they had two more children and coordinated their efforts and assets as if they were married, including investing in the success of the "husband's" dental schooling and practice. *Hewitt*, 77 Ill. 2d at 53, 394 N.E.2d at 1205. After her complaint for divorce was dismissed, Victoria refiled. *Hewitt*, 77 Ill. 2d at 52-53, 394 N.E.2d at 1205. She claimed an equal share of the property and profits she accumulated with Robert, based on breach of his express promise that they would share their assets without need of a formal ceremony, implied contract, fraud on his part, and detrimental reliance on her part. *Hewitt*, 77 Ill. 2d at 53, 394 N.E.2d at 1205. The trial court dismissed Victoria's suit because there was no marriage, but the appellate court reversed, holding that because the relationship was outwardly a conventional marriage, Victoria should be allowed to recover from Robert.

*Hewitt*, 77 Ill. 2d at 54, 394 N.E.2d at 1206. In reinstating the trial judge's dismissal, the Supreme Court of Illinois wrote, "We do not intend to suggest that plaintiff's claims are totally devoid of merit" (*Hewitt*, 77 Ill. 2d at 66, 394 N.E.2d at 1211), but the court questioned whether allowing recovery to a woman who chose "to enter into what have heretofore been commonly referred to as 'illicit' or 'meretricious' relationships" would "encourage formation of such relationships and weaken marriage as the foundation of our family-based society" (*Hewitt*, 77 Ill. 2d at 58, 394 N.E.2d at 1207). The court left the parties where they were because the issues implicated this jurisdiction's public policy:

> "We are aware, of course, of the increasing judicial attention given the individual claims of unmarried cohabitants to jointly accumulated property, and the fact that the majority of courts considering the question have recognized an equitable or contractual basis for implementing the reasonable expectations of the parties unless sexual services were the explicit consideration. [Citation.] *** Of substantially greater importance than the rights of the immediate parties is the impact of such recognition upon our society and the institution of marriage. ***
>
> * * *
>
> *** The issue, realistically, is whether it is appropriate for this court to grant a legal status to a private arrangement substituting for the institution of marriage sanctioned by the State. The question whether change is needed in the law governing the rights of parties in this delicate area of marriage-like relationships involves evaluations of sociological data and alternatives we believe best suited to the superior investigative and fact-finding facilities of the legislative branch in the exercise of its traditional authority to declare public policy in the domestic relations field. [Citations.] That belief is reinforced by the fact that judicial recognition of mutual property rights between unmarried cohabitants would, in our opinion, clearly violate the [statutory ban on common law marriage]." *Hewitt*, 77 Ill. 2d at 57-61, 394 N.E.2d at 1207-09.

¶ 20    Thus, Brewer is correct when she argues that the court believed that allowing Victoria to recover from Robert would have contravened public policy and Blumenthal is correct that the court wanted to steer clear of sanctioning a common law marriage.

¶ 21    *Hewitt*'s reasoning was subsequently applied in *Ayala*, in which the court rejected a woman's claim for an equitable interest in a home in Warrenville, Illinois, which she and her boyfriend had constructed and resided in for 10 years. *Ayala v. Fox*, 206 Ill. App. 3d 538, 564 N.E.2d 920 (1990). The woman alleged the couple " 'lived together as husband and wife' " (*Ayala*, 206 Ill. App. 3d at 539, 564 N.E.2d at 921), but, citing *Hewitt*, the court declined to award her an interest in the " 'marital' residence" because doing so was contrary to the public policy expressed by the Illinois legislature to strengthen and preserve marriage. *Ayala*, 206 Ill. App. 3d at 542, 564 N.E.2d at 922 (citing *Hewitt*, 77 Ill. 2d at 65-66, 394 N.E.2d at 1211). *Hewitt*'s rationale was also pivotal in *Costa*–a case in which the typical roles were reversed–with a man suing a woman with whom he had lived for 24 years in a " 'quasi-marital' relationship, with 'all the indicia of a marital type relationship, including love, trust, mutual responsibilities and intimacy.' " *Costa v. Oliven*, 365 Ill. App. 3d 244, 245, 849 N.E.2d 122, 123 (2006). The woman built a successful business while the man stayed home to raise and home-school their child. *Costa*, 365 Ill. App. 3d at 245, 849 N.E.2d at 123. He alleged that during their years together, she took sole title to almost every asset and possession that was acquired through the couple's joint efforts and labor. *Costa*, 365 Ill. App. 3d at 245, 849 N.E.2d at 123. He argued that dismissing his complaint for failure to state a cause led to harsh

and unjust results, but the appellate court affirmed the dismissal, stressing that until the legislature made changes, this type of complaint would continue to fail. *Costa*, 365 Ill. App. 3d at 247-48, 849 N.E.2d at 125.

¶ 22 Brewer, however, has identified numerous changes in Illinois law which indicate that public policy has shifted dramatically in the ensuing 35 years and that ongoing application of *Hewitt* is no longer justified.

¶ 23 *Hewitt* relied on Illinois's former policy of discouraging cohabitation between unmarried parties and disfavoring nonmarital children. The court referred to the "traditional" rule in effect in "all jurisdictions" that enforcing property rights between former cohabitants amounts to enforcing a bargain in which all or part of the consideration has been illicit sexual intercourse. *Hewitt*, 77 Ill. 2d at 59, 394 N.E.2d at 1208. Since *Hewitt* was decided, however, Illinois's public policies toward nonmarital relationships and nonmarital children have significantly changed.

¶ 24 When *Hewitt* was decided in 1979, Illinois criminalized cohabitation and the Illinois Supreme Court affirmed a trial judge's decision to transfer custody of three children to their father because their mother was openly living with her boyfriend. See Ill. Rev. Stat. 1961, ch. 38, ¶ 11-8 (a "person who cohabits *** commits fornication if the behavior is open and notorious") (now 720 ILCS 5/11-40 (West 2010)); *Jarrett v. Jarrett*, 78 Ill. 2d 337, 345, 400 N.E.2d 421, 423 (1979) (holding that a mother's cohabitation with her boyfriend with no plans to marry was an affront to morality, injurious to the moral well-being and development of her children, and sufficient grounds for changing custody). The change in custody was granted despite the fact that Illinois places great emphasis on stability and continuity in custody arrangements. *In re Marriage of Wycoff*, 266 Ill. App. 3d 408, 410, 639 N.E.2d 897, 900 (1994) (indicating there is a presumption in favor of the existing custodial parent and that a custody arrangement should not be "lightly overturned"). A year prior, a mother who committed the same "moral indiscretion" of living with her boyfriend was allowed to retain custody of her children because she and the boyfriend said they intended to marry as soon as her second divorce became final. *Rippon v. Rippon*, 64 Ill. App. 3d 465, 381 N.E.2d 70 (1978). This was "a normal life" for the children. *Rippon*, 64 Ill. App. 3d at 468, 381 N.E.2d at 73.

¶ 25 By 1983, however, the Illinois Supreme Court acknowledged that a parent's cohabitation was not inherently harmful to a child and should not be used to deny custody. *In re Marriage of Thompson*, 96 Ill. 2d 67, 78, 449 N.E.2d 88, 93 (1983) (stating there was no conclusive presumption in Illinois that when a custodial parent cohabitates, the child is harmed). And, in 1990, the Illinois legislature repealed the language that criminalized cohabitation. See Pub. Act 86-490 (eff. Jan. 1, 1990) (deleting "cohabits" from criminal code). After the statute was changed, the primary basis for the result in *Hewitt*–that agreements between unmarried parties are not enforceable because their relationship is illicit–ceased to exist.

¶ 26 Shortly after that, the courts addressed a custody challenge based on same-sex cohabitation. A father disapproved of the mother's openness to their two children about her same-sex relationship and argued that she should have concealed it from them, instead of answering her daughter's questions while her son was present. *In re Marriage of R.S.*, 286 Ill. App. 3d 1046, 1049, 677 N.E.2d 1297, 1299 (1996). The father could not, however, point to any negative consequences (*In re Marriage of R.S.*, 286 Ill. App. 3d at 1053, 677 N.E.2d at 1301) and the evidence showed that the children were thriving in their mother's care (*In re Marriage of R.S.*, 286 Ill. App. 3d at 1055, 677 N.E.2d at 1303). The appellate court found that it was error to change custody on the basis of a parent's conduct which had no impact on her

children. *In re Marriage of R.S.*, 286 Ill. App. 3d at 1055, 677 N.E.2d at 1303. The appellate court returned sole custody to her. *In re Marriage of R.S.*, 286 Ill. App. 3d at 1055, 677 N.E.2d at 1303.

¶ 27		*Hewitt* also relied on policies that disfavored nonmarital children, due to concerns about inheritance rights, custody questions, and the "sociological and psychological effects" of children being in "that type of environment." *Hewitt*, 77 Ill. 2d at 58, 394 N.E.2d at 1208. Illinois has since repealed its policies denying recognition and protection to children born to unmarried parents. For instance, *Hewitt*'s statement that contracts between unmarried couples are presumptively unenforceable and illegal was based in part on, *Wallace*, an 1882 case in which an agreement between an unmarried father and mother to make their daughter his heir was held void as a verbal agreement in consideration of future illicit cohabitation. *Wallace v. Rappleye*, 103 Ill. 229, 249 (1882). Today, however, the Illinois Parentage Act of 1984 specifically provides that "[t]he parent and child relationship, including support obligations, extends equally to every child and to every parent, regardless of the marital status of the parents." 750 ILCS 45/3 (West 2012) (created in 1984 by Public Act 83-1372 (eff. July 1, 1985)). There has also been an amendment to the Illinois Probate Act of 1975 extending intestate inheritance rights to children of unmarried parents (see 755 ILCS 5/2-2 (West 2012) (amended in 1978 by Public Act 80-1429, § 1 (eff. Sept. 12, 1978))) and a similar amendment to the Illinois Pension Code indicates that children born to unmarried parents are entitled to the same survivor's benefits as other children (see 40 ILCS 5/1-104.2 (West 2012) (created in 1985 by Public Act 84-1028, § 1 (eff. Nov. 18, 1985))).

¶ 28		*Hewitt*'s discussion of the "traditional" rule that courts do not recognize property claims between unmarried couples was based in part on section 589 of the first version of the Restatement of Contracts. *Hewitt*, 77 Ill. 2d at 58-59, 394 N.E.2d at 1207-08 (quoting Restatement of Contracts § 589 (1932)). In 1981, the Restatement of Contracts was updated for the first time in 50 years. The current version of the legal treatise deleted section 589 and in doing so ceased to define all bargains between people in intimate relationships as illegal contracts. Restatement (Second) of Contracts (1981).

¶ 29		*Hewitt* was also premised on a section of Corbin on Contracts which has been abandoned. *Hewitt*, 77 Ill. 2d at 59, 394 N.E.2d at 1208 (citing 6A Arthur L. Corbin, Contracts § 1476 (1962)). That section, entitled "Bargains in Furtherance of Immorality," gave the example of lending money or supplying goods to a brothel, which is hardly the type of conduct that Brewer alleged in her claims against Blumenthal. 6A Arthur L. Corbin, Contracts § 1476, 623 (1962).

¶ 30		Furthermore, the current version of Corbin on Contracts recognizes that a cohabitating couple is a family and remarks, "The courts' treatment of contracts entered into by cohabitating parties evolved in the last part of the twentieth century and is clear evidence of how the courts' view of what might be against public policy varies with changes in society's views." 15 Grace McLane Giesel, Corbin on Contracts § 81.4, 205 (Joseph M. Perillo ed., rev. ed. 2003). The author of the treatise explains: "It is no coincidence that courts have become more receptive to enforcing contracts between cohabitating parties in an age in which a significant number of male and female couples as well as same gender couples cohabit. The shift in judicial treatment, while significant in effect, is subtle in terms of analytical differences." 15 Grace McLane Giesel, Corbin on Contracts § 81.4, 205 (Joseph M. Perillo ed., rev. ed. 2003). Courts reasoned that they were furthering the public policies of (1) protecting and encouraging marriage and (2) discouraging any exchange of sexual activity for value. 15 Grace McLane Giesel, Corbin on Contracts § 81.4, 207 (Joseph M. Perillo ed., rev. ed. 2003).

Those public policies are still in effect, but United States courts no longer perceive a conflict between furthering those policies and enforcing agreements between former cohabitants. United States courts are increasingly inclined to enforce agreements between former cohabitants. 15 Grace McLane Giesel, Corbin on Contracts § 81.4, 207-08 (Joseph M. Perillo ed., rev. ed. 2003). Corbin on Contracts identifies the California Supreme Court's opinion in *Marvin v. Marvin*, 557 P.2d 106 (Cal. 1976), as the "case that seems to have turned the tide of judicial treatment." 15 Grace McLane Giesel, Corbin on Contracts § 81.4, 213 (Joseph M. Perillo ed., rev. ed. 2003).

¶ 31    In *Marvin*, the parties cohabited for seven years and she sought, by way of a contract action, to enforce his oral promise that they would share earnings and property for life. The court stated that this type of agreement "even if expressly made in contemplation of a common living arrangement, is invalid only if sexual acts form an inseparable part of the consideration for the agreement." *Marvin*, 557 P.2d at 114. Instead, "any [s]everable portion of the contract supported by independent consideration will still be enforced." *Marvin*, 557 P.2d at 114. In other words, in reversing a judgment on the pleadings in his favor, the court concluded that nonmarital cohabitants should be treated "as any other persons," and that contracts between them are valid and enforceable so long as they are not solely and exclusively based on sexual services, *i.e.*, prostitution. *Marvin*, 557 P.2d at 116. The court emphasized that the institution of marriage is important and worthy of protection, but, nonetheless, *Marvin* "disconnected the link prior courts had perceived between cohabitation agreements and a public policy against sexual relations for value, stating that to 'equate the nonmarital relationship of today to [prostitution] ... is to do violence to an accepted and totally different practice.' " 15 Grace McLane Giesel, Corbin on Contracts § 81.4, 213-14 (Joseph M. Perillo ed., rev. ed. 2003) (quoting *Marvin*, 557 P.2d at 122). Thus, *Marvin* established the limited principle that cohabitation in itself is not illicit or meretricious and that the "judicial barriers that may stand in the way of a policy based upon the fulfillment of the reasonable expectations of the parties to a nonmarital relationship should be removed." *Marvin*, 557 P.2d at 122. Therefore, according to Corbin on Contracts, the majority of "modern" courts now enforce claims between former cohabitants. 15 Grace McLane Giesel, Corbin on Contracts § 81.4, 217 (Joseph M. Perillo ed., rev. ed. 2003).

> "Whereas cases decided [prior to] *Marvin* may have presumed that the sexual relationship was the substance of the agreement, cases after *Marvin* seem to presume that the relationship is not the substance of the agreement. These cases are not concerned that the agreement exists in the context of a sexual relationship, but rather are concerned only if the contract's 'primary' reason is sexual relations for value." 15 Grace McLane Giesel, Corbin on Contracts § 81.4, 219 (Joseph M. Perillo ed., rev. ed. 2003).

¶ 32    It is also worth noting that *Hewitt* may have had unintended consequences. The court acknowledged its intention to enforce legislative policies that intentionally penalized unmarried couples and their children as a means of discouraging cohabitation and encouraging marriage. *Hewitt*, 77 Ill. 2d at 58, 394 N.E.2d at 1207 (expressing concern that allowing unmarried partners to adjudicate mutual property disputes would "encourage formation of such relationships and weaken marriage as the foundation of our family-based society," and stating that "[o]f substantially greater importance than the rights of the immediate parties is the impact of such recognition upon our society and the institution of marriage"). The ruling, however, may have the contrary effect–refusing to hear claims between unmarried cohabitants

- 10 -

creates an incentive for some to not marry. A cohabitant who by happenstance or design takes possession or title to jointly acquired assets is able to retain them without consequence when their "financially vulnerable" counterpart is turned away by the courts. Candace Saari Kovacic-Fleischer, *Cohabitation and the Restatement (Third) of Restitution and Unjust Enrichment*, 68 Wash. & Lee L. Rev. 1407, 1424 (2011) (pointing out that denying remedies because there has been unmarried cohabitation punishes only one of the two cohabitants and enriches the other). "Such an unequal outcome itself might weaken rather than strengthen the institution of marriage because it creates an incentive for the more financially savvy partner to opt out of marriage." Candace Saari Kovacic-Fleischer, *Cohabitation and the Restatement (Third) of Restitution and Unjust Enrichment*, 68 Wash. & Lee L. Rev. 1407, 1424 (2011).

> "[T]his court and the courts of other jurisdictions have, in effect, sometimes said, 'We will wash our hands of such disputes. The parties should and must be left to their own devices, just where they find themselves.' *** [S]uch pronouncements seem overly fastidious and a bit fatuous. They are unrealistic and, among other things, ignore the fact that an unannounced (but nevertheless effective and binding) rule of law is inherent in any such terminal statements by a court of law. The unannounced but inherent rule is simply that the party who has title, or in some instances who is in possession, will enjoy the rights of ownership of the property concerned. The rule often operates to the great advantage of the cunning and the shrewd, who wind up with possession of the property, or title to it in their names, at the end of a so[-]called meretricious relationship. So, although the courts proclaim that they will have nothing to do with such matters, the proclamation in itself establishes, as to the parties involved, an effective and binding rule of law which tends to operate purely by accident or perhaps by reason of the cunning, anticipatory designs of just one of the parties." *West v. Knowles*, 311 P.2d 689, 692-93 (Wash. 1957) (Finley, J., specially concurring).

¶ 33    Also essential to *Hewitt*'s holding was the court's conclusion that the legislature's then-recent decision to "retain[ ] fault grounds for dissolution of marriage" reflected a public policy to "prevent[ ] the marriage relation from becoming in effect a private contract terminable at will." *Hewitt*, 77 Ill. 2d at 63-64, 394 N.E.2d at 1210. The court construed this as "another indication that public policy disfavors private contractual alternatives to marriage." *Hewitt*, 77 Ill. 2d at 64, 394 N.E.2d at 1210. The court remarked that California's ruling in *Marvin* was "facilitated" in part by California's no-fault divorce law. *Hewitt*, 77 Ill. 2d at 61, 394 N.E.2d at 1209. At the time, Illinois was one of only three states retaining fault grounds for the dissolution of marriage. *Hewitt*, 77 Ill. 2d at 63, 394 N.E.2d at 1210. Five years later, however, the Illinois legislature adopted no-fault divorce, allowing either spouse to terminate a marriage due to "irreconcilable differences." 750 ILCS 5/401(a)(2) (West 2010) (created by Public Act 83-954 (eff. July 1, 1984)). As the court recognized in *Karbin*, the legislature's adoption of no-fault divorce was a significant change in Illinois public policy and gave individuals the freedom and dignity to choose whether to end their marriages, instead of restricting divorce only to situations where "the court would assign blame or fault to a specific spouse." *Karbin v. Karbin*, 2012 IL 112815, ¶ 38, 977 N.E.2d 154 (holding that common law preventing plenary guardian from bringing divorce action on behalf of mentally disabled ward had been abrogated by subsequent legislation and rulings). Furthermore, although Illinois has a long history of enforcing premarital agreements (see, *e.g.*, *Seuss v. Schukat*, 358 Ill. 27, 33-34 (1934) (enforcing premarital agreement executed in 1912 providing for wife to retain her real estate despite her impending marriage)), the legislature's codification of the Uniform

Premarital Agreement Act in 1990 is a contemporary indication that the Illinois legislature sees no conflict between recognizing private contractual agreements and furthering the state's interest in supporting and strengthening marriage. See 750 ILCS 10/1 *et seq.* (West 2010); *In re Marriage of Barnes*, 324 Ill. App. 3d 514, 517, 755 N.E.2d 522, 525 (2001) (indicating that historically, premarital agreements that limited spousal maintenance or distributed property upon divorce were invalidated on public policy grounds because they were said to be conducive to divorce, but it is now "clear that there is no longer any general public policy opposed to agreements contemplating divorce"). In short, the enactment of statutes providing for no-fault divorce and the enforcement of prenuptial agreements have resolved *Hewitt*'s concern that recognizing property rights between unmarried cohabitants would somehow contravene the public policy of strengthening and preserving the institution of marriage.

¶ 34    We have also considered that the Illinois legislature enacted the Illinois Religious Freedom Protection and Civil Union Act, which provides for unmarried couples to enter into Illinois civil unions and receive all the rights and burdens available to married couples in this jurisdiction. 750 ILCS 75/1 *et seq.* (West 2010). In addition, same-sex couples are now able to marry in Illinois as of June 1, 2014. Pub. Act 98-597, § 1 (eff. June 1, 2014) (adding 750 ILCS 80/1 *et seq.*). The express purpose of the new Religious Freedom and Marriage Fairness Act is "to provide same-sex and different-sex couples and their children equal access to the status, benefits, protections, rights, and responsibilities of civil marriage." Pub. Act 98-597, § 1 ( eff. June 1, 2014) (adding 750 ILCS 80/10). Illinois also now recognizes the rights of unmarried couples (and individuals) to adopt children. 750 ILCS 50/2 (West 2010). And, many of Illinois's public and private employers are treating cohabitating domestic partners as family members and extend insurance benefits to both partners. See Proposed Resolution Amendment to the Cook County Employee Domestic Partnership Benefits Resolution, Report of the Committee on Human Relations, Board of Commissioners of Cook County, June 24, 2008 (stating "many private companies, including approximately 500 Fortune 1000 companies, and many units of local government, as well as numerous colleges and universities, provide health insurance and other benefits to [their] Employees for their domestic partners"). Also, since *Hewitt* was decided, the courts have held that unmarried private sexual relationships, whether they be opposite-sex or same-sex relationships, are a form of intimate conduct that are protected by the federal constitution. *Lawrence v. Texas*, 539 U.S. 558 (2003) (holding that regardless of whether the participants are married, a private homosexual relationship is a form of intimate human conduct that is protected as a liberty interest against unreasonable public interference); *Christensen v. County of Boone, Illinois*, 483 F.3d 454 (7th Cir. 2007) (holding that an unmarried heterosexual couple in a long-term relationship was entitled to the same constitutional protection as the homosexual couple in *Lawrence*); *Roberts v. United States Jaycees*, 468 U.S. 609 (1984) (analyzing the right of individuals to engage in intimate associations, the first type of association being for the purpose of engaging in expression protected by the first amendment, and the second type being certain intimate human relationships which enable persons to independently define their identity, an ability that is central to liberty); *Lehr v. Robertson*, 463 U.S. 248, 258 (1983) ("the relationship of love and duty in a recognized family unit is an interest in liberty entitled to constitutional protection"). In other words, Illinois now respects and supports the relationships that *Hewitt* labeled as illicit or immoral.

¶ 35    We acknowledge *Hewitt*'s statement that it is the legislature's role to declare public policy in the domestic relations field. *Hewitt*, 77 Ill. 2d at 61, 394 N.E.2d at 1209. After having

reviewed the legislation that was enacted during the years that Brewer and Blumenthal were together, buying a house, having children, dividing up their domestic responsibilities and pursuing their legal and medical careers, we conclude that although Brewer and Blumenthal were not legally entitled to marry in this jurisdiction, the legislature no longer disfavors their 26-year cohabitation or Brewer's claims against Blumenthal. Furthermore, Brewer did not allege an agreement with Blumenthal based on illicit consideration of sex, which was the primary historical rationale for rejecting cohabitation agreements. Instead, Brewer, who never had the option of marrying Blumenthal in Illinois, alleged that the couple intentionally comingled and shared their assets based on a mutual commitment and expectation of a lifelong relationship, that they divided their domestic and work responsibilities to best provide for the three children they had together, and that neither partner intended for their decisions and family roles to leave Brewer at a financial disadvantage later in life.

¶ 36    The important changes in Illinois law are consistent with changes in other jurisdictions. Based on its survey of modern authority, in 2011, the Restatement (Third) of Restitution and Unjust Enrichment added a new section that specifically allows former cohabitants to bring claims against each other to "prevent unjust enrichment upon the dissolution of the relationship." Restatement (Third) of Restitution and Unjust Enrichment § 28 (2011). That new section provides:

> "If two persons have formerly lived together in a relationship resembling marriage, and if one of them owns a specific asset to which the other has made substantial, uncompensated contributions in the form of property or services, the person making such contributions has a claim in restitution against the owner as necessary to prevent unjust enrichment upon the dissolution of the relationship." Restatement (Third) of Restitution and Unjust Enrichment § 28 (2011).

¶ 37    Brewer points out that today, nearly every state permits unmarried partners to bring common law claims to resolve their property disputes, even though these same jurisdictions do not permit common law marriage. See, *e.g.*, *Wood v. Collins*, 812 P.2d 951 (Alaska 1991); *Cook v. Cook*, 691 P.2d 664 (Ariz. 1984); *Bramlett v. Selman*, 597 S.W.2d 80 (Ark. 1980); *Marvin v. Marvin*, 557 P.2d 106 (Cal. 1976); *Boland v. Catalano*, 521 A.2d 142 (Conn. 1987); *Mason v. Rostad*, 476 A.2d 662 (D.C. 1984); *Poe v. Estate of Levy*, 411 So. 2d 253 (Fla. Dist. Ct. App. 1982); *Simmons v. Samulewicz*, 304 P.3d 648 (Haw. Ct. App. 2013); *Glasgo v. Glasgo*, 410 N.E.2d 1325 (Ind. Ct. App. 1980); *Akers v. Stamper*, 410 S.W.2d 710 (Ky. Ct. App. 1967); *Donovan v. Scuderi*, 443 A.2d 121 (Md. Ct. Spec. App. 1982).[2] Accordingly, we see no conflict between our conclusions about Brewer's claims against her former domestic partner and Illinois's ban on common law marriage.

¶ 38    Blumenthal has contended that Brewer is attempting to retroactively redefine what the parties' relationship was in order to claim the benefits of a legal marriage, much like the petitioner did in *In re Estate of Hall*, 302 Ill. App. 3d 829, 707 N.E.2d 201 (1998). We disagree. In that probate case, the petitioner, who was never married to her same-sex life partner, sought to be recognized as the "surviving spouse" within the meaning of a section of the Probate Act that entitles surviving spouses to a share of the decedent's estate. *Estate of*

---

[2]Common law marriage in the United States still occurs only in the District of Columbia and 10 states: Alabama, Colorado, Iowa, Kansas, Montana, New Hampshire, Oklahoma, Rhode Island, South Carolina, and Texas. See National Conference of State Legislatures, *Common Law Marriage by State*, http://www.ncsl.org/research/human-services/common-law-marriage.aspx (last visited Dec. 16, 2014).

*Hall*, 302 Ill. App. 3d at 832, 707 N.E.2d at 203 (quoting 755 ILCS 5/2-1(a) (West 1996)). Brewer, however, is not bringing a statutory claim or asking the court to give her a new legal status or descriptive title. Brewer wants only to bring common law claims that are available to other people. We find that Brewer has the right to do so and that the trial court's dismissal of her claims was in error.

¶ 39 In light of this conclusion, we do not need to reach appellant Brewer's alternative contentions that preventing unmarried domestic partners from pursuing common law claims available to all other persons, solely because they had or have an intimate relationship, violates the Illinois and federal constitutional guarantees of due process and equal protection of the laws. See U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. I, §§ 2, 12.

¶ 40 Finally, Blumenthal contends that even absent *Hewitt*, Brewer's counterclaims do not factually state the elements necessary for any claims of implied contractual relief. Blumenthal made this argument in the trial court, but the judge did not resolve it. This was error. Accordingly, we vacate the dismissal that was based on *Hewitt* and remand with directions to consider the parties' remaining arguments. We have not considered those arguments and have no opinion about them.

¶ 41 Vacated and remanded with directions.