NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

In the Matter of:

O'HARA FAMILY TRUST SECOND AMENDMENT AND
RESTATEMENT OF THE O'HARA FAMILY TRUST,

DONALD HOGAN; MICHAEL HOGAN and LOIS MACLEOD,
*Petitioners/Appellants*,

*v.*

ROBERT N. O'HARA, JR.; SUSAN A. O'HARA; and TERI L. DUNNE,
*Respondents/Appellees*.

No. 1 CA-CV 15-0059
FILED 6-21-2016

Appeal from the Superior Court in Maricopa County
No. PB2013-002007
The Honorable Edward W. Bassett, Judge

**REVERSED AND REMANDED**

COUNSEL

Ryley Carlock & Applewhite, Phoenix
By Clarke H. Greger, John C. Lemaster, Philip J. Jang
*Counsel for Petitioners/Appellants*

Buchalter Nemer, Scottsdale
By J. Noland Franz, Roger W. Hall
*Counsel for Respondents/Appellees*

---

**MEMORANDUM DECISION**

---

Presiding Judge Diane M. Johnsen delivered the decision of the Court, in which Judge Patricia A. Orozco joined. Judge Kenton D. Jones dissented.

---

**J O H N S E N**, Judge:

**¶1**        The sister and children of Joan O'Hara (collectively, "the Hogans") appeal the superior court's entry of summary judgment in favor of Robert O'Hara and his children (collectively, "the O'Haras"), dismissing the Hogans' claim for reformation of a trust. For the following reasons, we reverse the summary judgment and remand the matter to the superior court.

**FACTS AND PROCEDURAL BACKGROUND**

**¶2**        Robert and Joan O'Hara were married in 1975.[1] Each had children from a previous marriage. In January 1986, Robert and Joan established the O'Hara Family Trust. Under the trust, when the first spouse died, three sub-trusts would be created. The surviving spouse's separate property and that spouse's portion of the community property were to be placed in a "survivor's trust." The remaining assets were the decedent-spouse's separate property and his or her portion of the community property. Of those, some were to be placed in a marital-deduction "qualified" trust; the rest were to be placed in a so-called "bypass trust." The surviving spouse was to maintain control over the survivor's trust. The survivor also was to receive all income from the qualified and bypass trusts and could draw on the principal of the qualified and bypass trusts for his or her "support, maintenance and health." When the surviving spouse died, the qualified and bypass trusts were to be distributed to Robert's and Joan's

---

[1]        We view the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the party opposing a motion for summary judgment. *Andrews v. Blake*, 205 Ariz. 236, 240, ¶ 12 (2003).

descendants or their spouses "as appointed under the surviving [spouse's] will."

¶3        Ten years later, Robert and Joan amended and restated their trust. The 1996 amendment retained the surviving spouse's rights to control the survivor's trust, to receive the income from the qualified and bypass trusts and to draw from the principal of the qualified and bypass trusts as appropriate for his or her "health care, maintenance and support." But the 1996 amendment changed the allowable distribution of the principal remaining in the qualified and bypass trusts upon the death of the second spouse. Although the 1986 Trust would have allowed the surviving spouse to direct the distribution of the assets remaining in the qualified and bypass trusts to the descendants of *either or both* spouses, the 1996 amendment provided that, upon his or her death, the surviving spouse could appoint qualified and bypass trust assets only to the descendants of *the first deceased spouse*. The 1996 amendment further specified that although the surviving spouse would be free to amend or revoke the terms of the survivor's trust, the qualified and bypass trusts "shall be irrevocable," subject to these provisions.

¶4        In 2011, Joan was diagnosed with ALS. Her primary caregiver after she was diagnosed, and as the disease progressed, was her sister Lois, who lived with her and Robert. Early in 2012, with Joan's health significantly failing, Joan's adult son Don traveled to Arizona to spend the final weeks of his mother's life with her. He was present in January, when Joan and Robert met with a lawyer about a second amendment to their trust.

¶5        Joan had told Don on at least 10 occasions that when she and Robert died, the contents of their trust would be divided equally between her children and Robert's children. Joan told him in late November 2011 that they were going to amend the trust, and that it was Robert's idea. Robert was the one who contacted the lawyer about changing the trust; Joan told Don she didn't know why the trust needed to be amended. On January 5 or 6, 2012, she told Don she "was actually a little upset" about Robert's plan to amend their trust again and "she didn't understand why changes needed to be made." Joan told Don that she "wasn't even sure what was in the second amendment." Don further testified: "[Joan] said she didn't know why [the trust] needed to be changed. . . . [T]hat there was nothing that needed to be changed."

¶6        Robert made an appointment with a lawyer for January 11, 2012, for him and Joan to sign the amended trust. The appointment was at

the office of Karen Sinchak-Higby ("Sinchak"), a lawyer who had prepared the original trust and the 1996 amendment. Don drove the couple to the appointment and sat in the meeting with them and the lawyer. By then, Joan was greatly suffering in the advanced stages of ALS. She was wheelchair-bound, on oxygen and had extreme difficulty speaking. It was almost certain that she would be the first of the two spouses to pass. Robert testified he did not believe Joan read the 2012 amendment before she signed it, nor had anyone read it to her. Nor did Joan ask any questions during the signing meeting.

¶7            During that meeting, Sinchak told Robert, Joan and Don that under the new amendment, after one spouse died, the assets would be split into two trusts, a survivor's trust and a bypass trust. Sinchak said the surviving spouse would have 100 percent access to the survivor's trust, but would be able to access the bypass trust only in the event of "dire need." Sinchak further told the group that upon the death of the surviving spouse, the assets of the trusts would be combined and divided, with 45 percent going to Joan's children, 45 percent going to Robert's children, and ten percent divided between Joan's sister Lois and Robert's sister. Sinchak did not inform the group that the 2012 amendment would allow the surviving spouse to alter the provisions of the trust, and she did not say anything about a power of appointment that would allow the survivor to distribute the assets to whomever he or she wanted.

¶8            The 2012 amended and restated trust contained the same powers found in the 1996 amendment that granted the surviving spouse control over the survivor's trust and also allowed the surviving spouse to draw down the principal of the bypass trust for the survivor's "healthcare, maintenance and support." The 2012 trust, however, contained a new provision not present in any earlier version of the trust, by which the surviving spouse could distribute the principal of the bypass trust to anyone he or she might choose (other than the survivor or his or her creditors):

> [T]he Trustee shall distribute such amounts of the principal to any one or more persons other than the Surviving Trust Creator and his or her creditors, in such portions and on such terms as the Surviving Trust Creator appoints by a written instrument specifically referring to this power of appointment.

The 2012 trust further provided that assets remaining in the qualified and bypass trusts would not necessarily pass to the first-deceased spouse's

children when the second spouse died. Instead, the 2012 trust granted the surviving spouse the power to make an appointment, effective at the time of his or her death, of the assets remaining in the qualified and bypass trusts to anyone other than a creditor of the surviving spouse. If anything remained in the trusts after the surviving spouse's appointment, the proceeds would be distributed as provided in "Schedule G," which set out allowances of 45 percent to Joan's children, 45 percent to Robert's children and five percent each to Joan's sister and Robert's sister.

¶9 Joan and Robert signed the 2012 trust amendment in the presence of two witnesses, and Sinchak notarized the document.

¶10 By the time Joan died in late February 2012, the relationship between Joan's and Robert's family members had deteriorated significantly, and it continued to deteriorate thereafter. In May 2012, exercising his power of appointment under the 2012 amendment, Robert directed that upon his death, assets in the bypass trust would be combined with the assets in the survivor's trust, and that the combined assets would be distributed five percent to his sister, and the remaining 95 percent be divided one half for his two children and the other half for Joan's two surviving children, in equal shares. But less than a year later, Robert executed another amended and restated trust under which Joan's two children would receive nothing. Under the February 2012 amendment, Robert exercised his power of appointment to direct that, at his death, the assets in the bypass trust would be divided five percent to his sister and the remaining 95 percent divided between his two children, in equal shares. Driving home the purpose of the February 2012 amendment to exclude Joan's family, the document stated, "I intentionally have not provided for" Joan's children, nor for her sister.

¶11 In August 2013, Don Hogan, his brother Michael Hogan, and Joan's sister, Lois McLeod, filed a petition to reform the 2012 amendment pursuant to Arizona Revised Statutes ("A.R.S.") section 14-10415 (2016).[2] The complaint named as defendants Robert and his two children, Susan O'Hara and Teri Dunne. In due course, the superior court granted summary judgment to the O'Haras. We have jurisdiction over the Hogans'

---

[2] Absent material revisions after the relevant date, we cite a statute's current version.

timely appeal pursuant to A.R.S. §§ 12-120.21(A)(1) (2016) and -2101(A)(1) (2016).[3]

## DISCUSSION

**¶12**    The Hogans argue the superior court erred in granting summary judgment in the face of a genuine disputed issue of material fact about whether Joan understood and intended that, with her own death imminent, the 2012 amendment would grant Robert the power to divert the bypass trust from her sister and her sons to his own family members.

**¶13**    We review a grant of summary judgment *de novo*. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 482, ¶ 13 (2002). Summary judgment is proper if "the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). In reviewing a grant of summary judgment, we view the evidence and draw all reasonable inferences "in the light most favorable to the party opposing the motion," and we construe those inferences in favor of that party. *Wells Fargo*, 201 Ariz. at 482, ¶ 13. The court should grant a motion for summary judgment if "the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme Sch. v. Reeves*, 166 Ariz. 301, 309 (1990).

**¶14**    Pursuant to A.R.S. § 14-10415:

> The court may reform the terms of a trust, even if unambiguous, to conform the terms to the settlor's intention if it is proved by clear and convincing evidence that both the settlor's intent and the terms of the trust were affected by a mistake of fact or law, whether in expression or inducement.[4]

---

[3]    The O'Haras filed a notice of appeal from the superior court's partial denial of their motion for Rule 11 sanctions and for attorney's fees pursuant to A.R.S. §§ 12-349 (2016), 14-1105 (2016), -11004 (2016). Because the notice was not timely filed, *see* ARCAP 9, we lack jurisdiction to address that appeal, *see Edwards v. Young*, 107 Ariz. 283, 284 (1971).

[4]    "Settlor" is defined as "a person, including a testator, who creates or contributes property to a trust." A.R.S. § 14-10103(16) (2016). "If more than

¶15        When, as here, the law requires clear and convincing evidence, we inquire whether the evidence presented "is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Dombey v. Phoenix Newspapers, Inc.*, 150 Ariz. 476, 486 (1986) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).   We therefore determine whether a reasonable person could conclude there was clear and convincing evidence that "both the settlor's intent and the terms of the trust were affected by a mistake of fact or law" - the essential elements of a reformation claim.  *See* A.R.S. § 14-10415.

¶16        The Hogans argue the 2012 amendment did not reflect Joan's intent that the couple's assets be divided equally between their respective sets of children.  They cite the official commentary to the Uniform Trust Code § 415, from which A.R.S. § 14-10415 is derived, which explains, "A mistake of expression occurs when the terms of the trust misstate the settlor's intention, fail to include a term that was intended to be included, or include a term that was not intended to be included." *See State v. Sanchez*, 174 Ariz. 44, 47 (App. 1993) (commentary to a uniform code "is highly persuasive unless erroneous or contrary to settled policy in this state").

¶17        In response to the O'Haras' motion for summary judgment, the Hogans presented affidavits, deposition testimony and the opinion of an expert witness in support of their contention that Joan did not intend by signing the 2012 amendment to allow Robert to divert the bypass trust from Joan's family.  The Hogans argued that, to the contrary, Joan understood and intended that the ultimate distribution of trust assets would be as set out in Schedule G, with five percent going to Lois, five percent going to Robert's sister, and the remainder divided equally between the two sets of grown children.  In addition to the record facts recounted above, Don testified that even after Joan and Robert executed the 2012 amendment, Joan told him that the trust would be divided equally between her children and Robert's.  *See* Ariz. R. Evid. 803(3) ("statement of the declarant's then-existing state of mind" is not excluded by the rule against hearsay).

¶18        As noted, Robert testified he did not believe Joan read the 2012 trust, and there is no evidence in the record that Sinchak, the lawyer, provided a copy to either of them before the signing meeting.  Don's

---

one person creates or contributes property to a trust, each person is a settlor of the portion of the trust property attributable to that person's contribution except to the extent another person has the power to revoke or withdraw that portion." *Id.*  It is undisputed that both Joan and Robert are settlors of their trust.

account of Sinchak's explanation of the document at that meeting is undisputed. As Don recounted, Sinchak's "explanation" entirely failed to inform Joan that the amendment she was about to sign would allow Robert to deprive her children of any share in the couple's assets. Don testified that Sinchak "absolutely did not discuss" any power of appointment during the signing meeting. Nor did Sinchak explain to the group that the surviving spouse would have the power to alter the trust. The O'Haras offered testimony by Sinchak that she explained the 2012 amendment over the phone to Joan's sister Lois, and that Lois explained it to Joan. But Lois testified she did not recall having any discussion with Joan about the amendment.

¶19 The Hogans also offered an opinion letter by an expert probate lawyer.[5] The expert explained that the 1996 amendment, which provided for the distribution of the couple's assets to their respective families, is typical of a trust created by a husband and wife with children from prior marriages. According to the expert, the 2012 amendment to the trust "radically departs from the Settlors' original objectives quantified" in the 1996 amendment: "No longer is there any protection for the deceased spouse's descendants/beneficiaries." The power of appointment that the 2012 amendment grants to the surviving spouse is "the broadest possible," and allowed Robert to appoint Joan's property to "almost anyone – his children, new wife, girlfriend, etc." The expert went on to point out that the broad power of appointment is inconsistent with a provision that follows directly thereafter in the 2012 document, by which Joan and Robert reference their "testamentary wishes" that their assets be distributed as provided in Attachment G (i.e. to their respective sisters and children). Given that the 2012 amendment does not reflect the protections normally expected in such a blended-family situation, and the absence of notes or correspondence from Sinchak confirming that she discussed the implications of the manner in which the 2012 amendment was drafted, the expert concluded that the amendment did not reflect Joan's intent.

¶20 Although the dissent questions the expert witness's insight into Joan's intent, it is undisputed that, as the expert pointed out, the 2012 amendment drastically departed from the existing trust document, which would not have allowed Robert to deprive Joan's grown children of a share

---

[5] Although the dissent questions the admissibility (on hearsay grounds) of the expert opinion on summary judgment, the O'Haras did not object to the opinion in the superior court. In any event, any hearsay concern could have been remedied by an affidavit by the expert affirming his opinion letter.

of the trust. Given the evidence that Joan intended her children to share in the trust, and the absence of evidence that anyone explained to her that the 2012 amendment would allow Robert to cut out her children from the trust, there is sufficient evidence to create a genuine issue of material fact, even under a clear-and-convincing standard. The dissent argues that the 1996 version of the trust contained an appointment power, but under that power, the surviving spouse was permitted upon his or her death to appoint the bypass trust assets only to the descendants of the first-deceased spouse. That is a far cry from the 2012 amendment, which, as seen, allowed the survivor to appoint the assets entirely away from the descendants of the first-deceased spouse.

¶21　　　The O'Haras argue that Joan willingly signed the 2012 amendment and note that the Hogans do not challenge her competence to have done so. But the amendment is a complex 50-page document with scores of interrelated provisions written in lawyer's language, not plain English. The question is not whether Joan was mentally competent when she signed it; the question is whether she knew and understood what she was signing. There is no evidence in the record that the document could have been understood by an average person without explanation, and the explanation in the record by the couple's lawyer omitted any mention of the provision that Robert ultimately relied on to deprive Joan's family of a share of the couple's assets. Moreover, at the time of the amendment, Joan and Robert both knew that Joan would soon die, meaning that to the extent that the 2012 amendment gave the "surviving spouse" any extraordinary powers, those powers would go to Robert, not Joan. Under the circumstances, and the evidence that she understood and intended that the trust would be divided equally between her family and Robert's, the evidence establishes a genuine issue of material fact about whether the 2012 amendment correctly reflected Joan's intent.

## CONCLUSION

¶22　　　For the foregoing reasons, we reverse the superior court's entry of summary judgment and remand for further proceedings. As the prevailing parties on appeal, the Hogans are entitled to their costs on appeal upon compliance with Arizona Rule of Civil Appellate Procedure 21.

**J O N E S**, Judge, dissenting:

¶23　　　To be successful in their claim for reformation of the 2012 amendment, the Hogans must "prove[] by clear and convincing evidence

that both the settlor's intent and the terms of the trust were affected by a mistake of fact or law, whether in expression or inducement." A.R.S. § 14-10415. To resolve this appeal, we must determine whether, based upon the evidence presented, a reasonable person could find by clear and convincing evidence that the terms of the trust did not reflect Joan's intent - specifically, that Joan did not intend for Robert to possess the power to appoint the assets of the bypass trust in a manner that would alter the distribution set forth in Schedule G of the instrument. *See supra* ¶ 10 (explaining how Robert exercised the power of appointment over the assets of the bypass trust to alter the distribution). In my view, the majority is too generous in its conclusions that the evidence presented by the Hogans is either competent or probative of Joan's intent, and that such evidence is sufficient to defeat a motion for summary judgment in light of the heightened standard of proof required by A.R.S. § 14-10415. *See Orme Sch.*, 166 Ariz. at 309 (holding the trial court should grant a motion for summary judgment if "the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense").

¶24        First, the Hogans rely upon the deposition testimony of Donald Hogan and Robert O'Hara. Donald, Joan's son and a beneficiary under Schedule G of the 2012 amendment, testified Joan told him she wanted her children and sister to have a share of her assets upon her death. *See supra* ¶ 5. But, this testimony is not probative of whether Joan intended the distribution set forth in Schedule G to be subject to the surviving spouse's power of appointment - the material fact at issue here. In fact, Donald's testimony relevant to that material fact was that he never spoke to Joan about whether the surviving spouse would be able to change the terms of the trust.

¶25        Donald also testified Joan told him she did not understand why Robert wanted to amend the trust in 2012. *See supra* ¶ 5. Along these same lines, Donald testified Sinchak, the attorney who prepared the original trust and subsequent amendments, did not adequately explain the 2012 amendment, and Robert testified he did not believe Joan read the 2012 amendment prior to signing it.[6] *See supra* ¶¶ 6-7. Even assuming these

_____

[6]        The majority relies, at least in part, on "the lack of evidence in the record" that Sinchak provided a copy of the 2012 amendment to Robert and Joan before they executed it. *See supra* ¶ 18. But, the lack of evidence regarding Sinchak's delivery of the actual document to Joan is not raised by

circumstances to be true, Joan's level of understanding of Robert's desire to effect the 2012 amendment and the purported inadequacy of Sinchak's explanations are not relevant to whether Joan intended it to contain certain terms. Moreover, contrary to the majority's assertion otherwise, *see supra* ¶ 18, Donald's self-serving testimony, as well as his actual presence at the meeting where the 2012 amendment was executed, were squarely disputed by Sinchak; she testified Donald was not present at the meeting and that, not only did both parties want to have all of the assets placed under the surviving spouse's control, but the power of appointment provision was a result of "many years of planning" and "many discussions . . . before this final meeting."

¶26 The only other relevant evidence proffered by the Hogans is an opinion letter from a probate attorney that had never met, spoken to, or corresponded with Joan. The letter, prepared long after Joan's death, contained the attorney's conclusion that the broad power of appointment was not "typical" for blended families, was inconsistent with Schedule G and prior iterations of the trust, and, therefore, did not accurately reflect Joan's intent. *See supra* ¶ 19. This Court should not consider the letter in determining the motion for summary judgment; the letter is not sworn or otherwise supported by sworn testimony and is therefore not proper for consideration in summary judgment proceedings. *See* Ariz. R. Civ. P. 56(e)(4) ("When a motion for summary judgment is made and supported as provided in this Rule, an opposing party may not rely merely on allegations or denials of its own pleading; rather its response must, *by affidavits or as otherwise provided in this Rule*, set forth specific facts showing a genuine issue for trial.") (emphasis added).

¶27 Even if we consider the opinion letter, it is still not competent evidence of Joan's intent. Competent evidence is that which provides "real-life facts and circumstances of the actual case." *Higgins v. Higgins*, 194 Ariz. 266, 271, ¶¶ 19-21, 23 (App. 1999) (concluding the personal belief that a mother's adulterous cohabitation has a detrimental effect on her children is not competent evidence of harm) (citation omitted). Competent evidence cannot be merely speculative and conclusory. *See Brown Wholesale Elec. Co. v. Safeco Ins. Co. of Am.*, 135 Ariz. 154, 158 (App. 1982). The probate attorney here had no personal knowledge of Joan, her intent, the discussions she had with Robert or her attorney, or any of the "real-life facts and circumstances of the actual case." What a disassociated attorney thinks a typical person

---

the Hogans in opposing the motion for summary judgment, and it is not relevant to our inquiry of whether Joan intended the 2012 amendment give the surviving spouse a broad power of appointment over the bypass trust.

might desire or include within testamentary documents does not elucidate the specific issue we must resolve: whether Joan intended something other than what was written in the 2012 amendment.

**¶28** Additionally, the attorney's opinion relies exclusively upon problematic circular reasoning and speculation. What should or should not have been included in the 2012 amendment is entirely dependent upon Joan's intent. But, the attorney's opinion that Joan did not intend the power of appointment provision contained therein presupposes her lack of intent. More specifically, the attorney concludes the 2012 amendment's broad power of appointment is inconsistent with Joan and Robert's "testamentary wishes" that their assets be distributed according to Schedule G. However, the distribution scheme set forth in the trust is, and its prior iterations always have been, effective only "to the extent the [surviving spouse] does not effectively exercise [the] power of appointment."[7] The attorney, in the absence of evidence regarding the "real-life facts and circumstances of the actual case," relied solely upon Schedule G in concluding that the 2012 amendment "'radically departs from the Settlors' original objectives quantified' in the 1996 amendment." *See supra* ¶ 19. The only way to accept this conclusion would be to ignore the fact that the provisions distributing the assets in the 1996 amendment and the original trust were subject to those granting the surviving spouse a power of appointment over those assets.

**¶29** After considering the competence and probative value of the evidence, we are left with Donald's self-serving and otherwise

---

[7] Contrary to Donald's self-serving testimony and the probate attorney's letter regarding Joan's intent, the previous trust instruments, which no one argued were *not* expressions of Joan's intent, both provided that distribution of the trust's assets were subject to the surviving spouse's power of appointment, albeit with varying degrees of limitation. The 1986 trust provided: "Upon the death of the surviving [spouse], the Trustee shall distribute the balance of the Bypass Trust to the Trustor's descendants or their spouses as appointed under the surviving Trustor's will. . . . Any assets not appointed shall be held and administered under the provisions of Article V." Similarly, the 1996 amendment provided: "[T]he Trustee shall from time to time distribute such amounts of the principal of the Bypass Trust to any one or more of the deceased Trustor's descendants, in such amounts and on such terms as the surviving Trustor appoints by a written instrument specifically referring to this power of appointment."

unsubstantiated testimony that Joan did not intend to grant Robert a broad power of appointment over the bypass trust.[8] Under a lower evidentiary standard, this testimony might be sufficient to create a genuine issue of material fact. However, because of the risk of fraudulent testimony in probate cases, the Hogans are tasked with proving their case by clear and convincing evidence. *See* Restatement (Third) of Property: Donative Transfers § 12.1 cmt. d (noting the requirement of clear and convincing proof protects against fraudulent testimony); *cf. Occidental Life Ins. Co. of Cal. v. Marsh*, 5 Ariz. App. 74, 76 (1967) (noting the "clear and convincing" standard provides "substantial protection" in a situation where there are no witnesses). Although the majority recognizes "the quantum of evidence required" must be considered when determining whether summary judgment is appropriate, *supra* ¶ 13, its analysis of the heightened standard of proof required by A.R.S. § 14-10415 is unconvincing. Even considering the facts in the light most favorable to the non-moving party, I cannot conclude that any reasonable person could agree with the Hogan's position based upon the dearth of evidence supporting their position. *See Orme Sch.*, 166 Ariz. at 309. Accordingly, I would affirm summary judgment in favor of the O'Haras.



Ruth A. Willingham · Clerk of the Court
FILED: AA

---

[8] Although the majority concedes the Hogans do not challenge Joan's competence to execute the 2012 amendment, it highlights evidence regarding Joan's poor health and concludes Joan did not read or understand the 2012 amendment. Again, however, our inquiry is limited to whether a reasonable person could find by clear and convincing evidence that Joan did not intend to grant Robert a broad power of appointment over the bypass trust.